## In the
## United States Court of Appeals
### For the Seventh Circuit

No. 01-1112

SIMEON PALAY,

*Plaintiff-Appellant*,

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 8169—**James B. Moran**, *Judge.*

ARGUED NOVEMBER 8, 2002—DECIDED NOVEMBER 12, 2003

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Simeon Palay, a federal prisoner, sustained injuries when a fight broke out among fellow inmates belonging to rival gangs at the Metropolitan Community Correctional Center in Chicago ("MCC"), where he was detained pending trial on criminal charges. Palay filed suit against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA"), asserting that MCC officials had been negligent in the following respects: they improperly reassigned him from a unit for pretrial detainees like himself to a "holdover" unit housing convicted prisoners and members of known rival gangs; they failed to provide secure housing and protect him from violent attack; and they failed to provide him

with timely and effective medical care for the injuries he received as a result of the gang fight. The district court dismissed Palay's complaint, concluding that Palay had failed to exhaust his administrative remedies with respect to the medical claim, that the reassignment and failure-to-protect claims were barred by the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a), and that the latter claims failed alternatively for want of a causal link between the asserted negligence of prison officials and Palay's injuries. We affirm in part and reverse in part.

## I.

The following facts are alleged in Palay's complaint. Given the procedural posture of the case, we accept them as true. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727 (1982).

Palay is a federal prisoner currently housed at the Federal Correctional Institution in Oxford, Wisconsin. In June 1998, Palay was detained at the MCC in Chicago, where he was awaiting trial on federal charges. On June 19, the second shift lieutenant and unit counselor at the MCC transferred Palay from the pretrial unit to Unit 21, a holdover unit housing individuals who had already been convicted (hereinafter, the "holdover unit"). The complaint alleges that the transfer was "improper[ ]." Complaint at 3 ¶ 11.

At approximately 8:00 p.m. on the evening of June 19, a fight broke out in the holdover unit among inmates affiliated with two rival gangs. In the course of that altercation, one of the gang members threw a fire extinguisher, which struck the bunk where Palay lay sleeping and

discharged into his face.[1] The discharge caused Palay to suffer an acute asthma attack. As he awoke choking, Palay sat up suddenly and struck his head on the bunk above him forcefully enough to blur his vision.

Another inmate helped Palay to a correctional officer's station, where an officer directed Palay to an adjacent room. He remained there for nearly an hour before he was taken to the medical unit for treatment. There, a physician's assistant treated him for his injuries and then released him to a correctional officer for return to the holdover unit.

Palay was returned to the holdover unit at approximately 10:15 p.m., just over two hours after the fight had broken out and he had sustained his injuries. Carbon dioxide fumes from the discharged fire extinguisher still lingered in the air, and as a result Palay suffered a second asthma attack upon his return to the unit.

Early the following day, a lieutenant questioned Palay about the incident, and he was placed in administrative detention pending further investigation. He was released several days later after officials determined that he was not a gang member and had not participated in the altercation. While he was placed in administrative detention, he

---

[1] The complaint alleges only that the extinguisher was discharged into Palay's face without specifying how. Complaint at 4 ¶ 12. The administrative claim that Palay filed with the Bureau of Prisons on the government's Standard Form 95 indicates that the extinguisher was triggered after it was thrown during the fight and struck the side of Palay's bed. App. 28. The district court took the contents of the Form 95 into consideration, reasoning that the form was a public record of which it was entitled to take judicial notice. *Palay v. United States*, 125 F. Supp. 2d 855, 858 n.1 (N.D. Ill. 2000). For present purposes, the parties do not dispute the facts underlying the discharge of the fire extinguisher.

received no treatment or additional medication for the injuries he had sustained during the fight.

Following his release from administrative detention and return to the holdover unit, Palay suffered a series of seizures. When the first occurred on June 23 (four days after he was injured), Palay was seen and treated by an MCC physician. Palay had experienced no seizures prior to this occasion. The second seizure occurred two weeks later while he was at the offices of the Federal Bureau of Investigation in Chicago. He was taken to a hospital, where a doctor diagnosed him with "New Onset Seizure Disorder." Both before and after this second seizure, Palay was refused medication by MCC medical staff. On his return to the MCC from the hospital, an MCC physician told Palay that he did not need to keep asking for medication because he was not having seizures. The physician advised him that he needed to "[e]at more and drink lots of water." Complaint at 6 ¶ 23. Days later, Palay suffered a third seizure in the middle of the night and awoke to find his bed soaked with urine. A correctional officer summoned a physician's assistant, who did not arrive for several hours and who failed to assess Palay's vital signs or provide any treatment.

On July 17, five days after his third seizure, Palay submitted an inmate request to an MCC counselor complaining about the refusal of MCC medical staff to provide him with medication for his condition. According to Palay, his complaint was ignored. The medical staff's alleged indifference, Palay contends, contributed to his pain and suffering. Complaint at 7 ¶ 27.

On February 4, 1999, Palay completed a Standard Form 95 "Claim for Damage, Injury, or Death" recounting the gang fight, the injuries he had sustained in that altercation, and the seizures he had suffered in the aftermath. In this administrative claim for relief, Palay asserted that

"[d]ue to the Bureau of Prisons['] failure to protect me from the violence of fighting gang members and the failure of keeping hostile gangs sep[a]rated from each other I have been subjected to an injury that has caused me severe pain and suffering and emotional and great mental anguish." App. 29. He expressed concern that the seizures would continue and that, upon release from prison, he would be unable to return to his former occupation as a forklift operator. App. 29-30. Palay claimed total damages in the amount of $500,000. App. 28, 30. He attached to the Form 95 a July 8, 1998 letter to the MCC from his attorney, Andrea Taylor, requesting copies of all records relating to Palay's medical treatment and/or examinations. In that letter, Taylor noted that Palay had been injured as a result of a gang fight among other inmates shortly after his transfer into the holdover unit of the MCC. She pointed out that Palay had suffered three seizures since his injury and expressed the "hope that Mr. Palay has been examined for these medical problems." App. 31. Palay's Form 95 was submitted to the Bureau of Prisons (the "BOP" or "Bureau").

In a memorandum dated June 18, 1999, the Bureau's regional counsel informed Palay that his claim was denied. "Investigation of your claim did not reveal that you suffered any personal injury as a result of the negligent acts or omissions of Bureau of Prisons employees acting within the scope of their employment," he wrote. App. 32. The memorandum advised Palay that he was free to file suit in federal court if he was dissatisfied with the agency's decision.

Within six months of the Bureau's action, Palay did file suit, naming the warden, associate warden, and four other employees of the MCC as defendants. The court granted him leave to proceed in forma pauperis. He subsequently complied with the district court's order to submit a copy of the final disposition of his administrative claim,

and he served five of the six individual defendants named in his complaint. The United States filed a notice certifying that the named defendants were acting within the scope of their employment at the time of the events underlying Palay's complaint and substituting the government as the defendant. R. 9. The government then moved to dismiss Palay's complaint, arguing in relevant part that the court lacked jurisdiction over the negligent reassignment and medical care claims because Palay had not exhausted his administrative remedies vis-à-vis those claims and that the claims should therefore be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

The district court ultimately dismissed Palay's claims, although in part for reasons other than those asserted by the government. *See Palay v. United States*, 125 F. Supp. 2d 855 (N.D. Ill. 2000) ("*Palay I*"); *Palay v. United States*, 2000 WL 1889668 (N.D. Ill. Dec. 27, 2000) ("*Palay II*"). The court agreed that it lacked jurisdiction over the medical claim because Palay had not asserted such a claim in his Form 95, and therefore had not exhausted his administrative remedies vis à vis that claim. *Palay I*, 125 F. Supp. 2d at 859-60.[2] By contrast, the court was satisfied that Palay had asserted his negligent reassignment claim in the

---

[2] Although the court dismissed the medical claim without prejudice, *Palay I*, 125 F. Supp. 2d at 860, the parties agree that at this juncture, there is nothing Palay could do that could resurrect the claim. The time for filing the claim at the administrative level has expired, so if, as the district court determined, Palay did not properly exhaust his administrative remedies with respect to this claim the first time around, the claim is now time-barred. *See* 28 U.S.C. § 2401(b) (claim barred unless presented to federal agency within two years after it accrues). The dismissal of the claim is therefore final for purposes of appellate jurisdiction. *See Larkin v. Galloway*, 266 F.3d 718, 721 (7th Cir. 2001), *cert. denied*, 535 U.S. 992, 122 S. Ct. 1551 (2002).

Form 95; the court viewed this claim as encompassed within the broader failure-to-protect claim that Palay had articulated in the form. *Id.* at 859. However, for either of two reasons that it raised sua sponte, the court concluded that the allegations concerning the BOP's reassignment of and failure to protect Palay failed to state a claim on which relief could be granted. *See* Fed. R. Civ. P. 12(b)(6).[3] First, in view of the broad discretion that prison officials possess with respect to the housing and protection of prisoners, the court believed that the negligent reassignment and failure-to-protect claims were foreclosed by the discretionary function exception to liability under the FTCA. *Palay I*, 125 F. Supp. 2d at 860-62; *Palay II*, 2000 WL 1889668, at *1-*3. *See* 28 U.S.C. § 2680(a); *United States v. Gaubert*, 499 U.S. 315, 111 S. Ct. 1267 (1991); *Calderon v. United States*, 123 F.3d 947 (7th Cir. 1997). Second, the court thought that the claims failed for want of proximate cause: Palay could not show that the pretrial unit at the MCC was substantially less dangerous than the holdover unit, such that his transfer from the former to the latter had anything to do with his injuries; and, for that matter, the chain of events that caused Palay's injuries was so complicated and happenstance as to have been unforeseeable to prison officials who made the deci-

---

[3] After raising these grounds in its first opinion on the government's motion to dismiss, the district court gave Palay thirty days to file a memorandum explaining why his remaining claims should not be dismissed on these grounds. *Palay I*, 125 F. Supp. 2d at 860, 864. When Palay failed to meet the deadline for his response, the court dismissed the case. R. 26. The court subsequently learned that Palay had filed a response (albeit past the due date) several days before the court had issued the dismissal order. The court treated the late response as a motion to reconsider, which the court then denied in a written opinion. *Palay II*, 2000 WL 1889668.

sion to transfer Palay. *Palay I*, 125 F. Supp. 2d at 862-63; *Palay II*, 2000 WL 1889668, at *3-*4.

## II.

Our review of the decision to dismiss Palay's suit is, of course, plenary. *E.g.*, *Johnson v. Apna Ghar, Inc.*, 330 F.3d 999, 1001 (7th Cir. 2003) (Rule 12(b)(1)), *cert. denied*, 2003 WL 22081403 (U.S. Nov. 3, 2003); *American United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 926 (7th Cir. 2003) (Rule 12(b)(6)). There are cases from this circuit (and others) describing two of the three grounds on which the district court disposed of Palay's claims—namely, failing to exhaust administrative remedies before filing suit, and challenging a decision that fails within the discretionary function exception to the FTCA—as jurisdictional in nature, rendering them appropriate for disposition to Federal Rule of Civil Procedure 12(b)(1). *See*, *e.g.*, *Sullivan v. United States*, 21 F.3d 198, 206 (7th Cir. 1994) (treating exhaustion requirement as jurisdictional); *Calderon v. United States*, *supra*, 123 F.3d at 950 (noting that discretionary function exception raises jurisdictional issues).[4] More recently, however, we have questioned whether the exhaustion requirement and the statutory exceptions to the FTCA truly are jurisdictional in nature. *See*, *e.g.*, *Frey v. EPA*, 270 F.3d 1129, 1135-36 (7th Cir. 2001) (exhaustion requirement); *Clark v. United States*, 326 F.3d 911, 913 (7th Cir. 2003) (per curiam) (section 2680(c)'s exception for tax-related claims). These cases suggest that the statutory prerequisites to suit and exceptions to

---

[4] As we noted above, the district court construed the exhaustion requirement as jurisdictional but treated the discretionary function exception and the question of proximate cause as matters going to the elements of Palay's claims.

governmental liability should instead be viewed as aspects of the plaintiff's statutory right to relief and, at the pleading stage, dealt with pursuant to Rule 12(b)(6).

We need not resolve the ongoing uncertainty as to whether these matters should or should not be labeled jurisdictional. What is at stake in this appeal is Palay's right to proceed beyond the pleading stage on his claims. The only sense in which the appropriate characterization of the statutory exceptions and prerequisites to suit would matter is if the district court, believing these matters to be jurisdictional, had exercised its authority under Rule 12(b)(1) to look behind the plaintiff's allegations and make factual findings for purposes of assessing its subject matter jurisdiction. *See LaSalle Nat. Trust, N.A. v. ECM Motor Co.*, 76 F.3d 140, 144 (7th Cir. 1996); *see also United Phosphorous, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 963 (7th Cir. 2003) (en banc) (dissent), *petition for cert. filed*, 72 U.S.L.W. 3129 (U.S. Aug. 7, 2003) (No. 03-203). If the court had done so, we of course would be obliged to defer to its findings of fact. *See id.* But the district court here did not do that; it confined its examination to the face of Palay's complaint[5] and took its allegations at face value, just as a court does in evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim. Likewise, we shall accept the allegations in Palay's complaint as true and grant him the benefit of every reasonable inference that may be drawn from those allegations. *Johnson*, 330 F.3d at 1001 (Rule 12(b)(1)); *American United Logistics*, 319 F.3d at 926 (Rule 12(b)(6)).

---

[5] The court did look to Palay's Form 95 for elucidation as to how the fire extinguisher was discharged. *See supra* n.1. However, in resolving a motion to dismiss, the district court is entitled to take judicial notice of matters in the public record. *Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000); *G.E. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997) (collecting cases).

## A. Exhaustion

The FTCA permits an individual to bring suit in federal court against the United States

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). Pursuant to this provision, federal inmates may bring suit for injuries they sustain while incarcerated as a consequence of the negligence of prison officials. *United States v. Muniz*, 374 U.S. 150, 83 S. Ct. 1850 (1963). However, the plaintiff may not bring such a suit unless he has first presented his claim to the appropriate federal agency and that agency has denied the claim. 28 U.S.C. § 2675(a).

> [A] claim shall be deemed to have been presented when a Federal agency receives from a claimant . . . an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for . . . personal injury . . . alleged to have occurred by reason of the incident . . . .

28 C.F.R. § 14.2(a). A plaintiff's failure to exhaust administrative remedies before he brings suit mandates dismissal of the claim. *McNeil v. United States*, 508 U.S. 106, 113, 113 S. Ct. 1980, 1984 (1993).

Palay, of course, completed a Standard Form 95 and submitted it to the appropriate agency—the Bureau of Prisons—for review. That form described the incident giving rise to Palay's injuries and requested a sum certain for those injuries. App. 28. The Bureau, in turn, denied his claim in writing.

The issue, however, is whether Palay "presented" his negligent reassignment and medical claims in the sense that he set forth the relevant facts in enough detail to alert the Bureau of Prisons to the presence of those claims. Palay was not obliged to plead legal theories in the Form 95. *Murrey v. United States*, 73 F.3d 1448, 1452 (7th Cir. 1996). But he did bear the burden of pleading the pertinent facts. *Id.* In that respect, his Form 95 is entitled to a generous construction. *See id.* at 1451-52. As the district judge observed, "[a]ll that is required is 'sufficient notice to enable the agency to investigate the claim.'" *Palay I*, 125 F. Supp. 2d at 859, quoting *Charlton v. United States*, 743 F.2d 557, 559 (7th Cir. 1984) (per curiam). "[A]ny cause of action fairly implicit in the facts" that Palay set forth in the Form 95 will be considered a claim that was "presented" to the Bureau of Prisons for purposes of the exhaustion requirement. *Murrey*, 73 F.3d at 1452. Put another way, if the claim would have been apparent to a "legally sophisticated reader" of the form, then we will charge the agency with notice of that claim and deem it to have been exhausted. *Id.* at 1453.

The district court found that Palay's negligent reassignment claim had been presented to the Bureau, and we agree. Palay's Form 95 expressly charged the Bureau with having failed to protect him from violence at the hands of fellow inmates (App. 29), and Palay's claim that the Bureau negligently reassigned him from the pretrial to the holdover unit is really just a more specific iteration of a failure-to-protect claim.[6] Moreover, Palay

---

[6] The district court treated the complaint as asserting a single claim for the failure to protect Palay. *See Palay I*, 125 F. Supp. 2d at 859. However, the parties agree that Palay is actually asserting two separate claims relating to his physical safety, one for the MCC's negligent reassignment of him to the holdover unit
(continued...)

attached to his Form 95 the letter from his attorney, and in so doing made that letter a part of his Form. *See Murrey*, 73 F.3d at 1452-53. In recapping the circumstances that culminated in the attack on Palay, his counsel made note of the fact that Palay had been transferred to a new unit on June 19 and that he was injured "[s]hortly after his transfer." App. 31. By noting both the transfer and its temporal nexus to the incident, the attorney's letter gave the legally sophisticated reader of his Form 95 reason to discern that there was a potential connection between Palay's reassignment and the harm that befell him. That Palay did not explicitly charge that the transfer was inappropriate is not dispositive; that claim was reasonably implicit in the facts that Palay had set forth in his papers. *See Murrey*, 73 F.3d at 1452-53 (informed consent claim implicit in allegation that doctors had assured patient and his family that surgery was only available therapy and would extend his life).

Whether Palay's medical malpractice claim was implicit in the facts that Palay set forth in his Form 95 is a much closer question. Although Palay described the injuries he sustained and the physical effects—including the recurrent seizures—that he suffered, he stated no facts suggesting that the prison medical staff had treated him inappropriately. Whereas, for example, Palay's complaint notes that an MCC physician had dismissed his seizure disorder and that his requests for seizure medication were repeatedly denied, there is not a hint of this in his Form 95. On the other hand, the complaint charges the defendants with denying Palay *timely* as well as effective medical care, and one might find the timeliness

---

[6] (...continued)
and a second claim for the failure to protect him from inmate violence. *See* Palay Br. at 6, Government Br. at 10; *see also* Complaint at 7-8, ¶ 28(a) & (b).

aspect of Palay's medical claim to be implicit in certain of the facts he alleged in the Form 95. For example, Palay noted that an hour passed after the attack before he was taken to the MCC medical unit for treatment; he also notes that at that time, his head was bleeding from the laceration he sustained when his head hit the bunk above him. App. 29. Palay also notes that his attorney's letter to the MCC expressed a hope that he was receiving adequate medical care and in addition requested access to his medical records. App. 31. But as the district court observed, although these statements might have signaled an intent to look into a possible medical claim, they did not suggest that Palay was presently asserting such a claim. *Palay*, 125 F. Supp. 2d at 859-60.

The most that can be said, really, is that Palay's claim put the Bureau on notice that he had been injured and that he had sought and received some medical treatment for his injuries. A complete investigation of Palay's injuries and the treatment he had received might well have disclosed the facts underlying his medical claim; and in the Fifth Circuit, that would be enough to put the government on notice of such a claim. *See Frantz v. United States*, 29 F.3d 222, 224-25 (5th Cir. 1994). But we have expressly declined to go as far as the Fifth Circuit has in that regard. *Murrey*, 73 F.2d at 1453. Under the law of this circuit, because Palay did not include facts in his Form 95 from which a legally sophisticated reader might have discerned that he had received inadequate medical treatment, it would appear that Palay did not exhaust his administrative remedies with respect to his medical claim.

But that does not preclude Palay from seeking relief for any harm he may have suffered as a result of the allegedly deficient medical care he received. It is a basic rule of tort law that the original tortfeasor is responsible not only for the injury directly resulting from the

tort but also for aggravation of that injury caused by negligence in the medical treatment occasioned by the injury. *E.g.*, *Selbe v. United States*, 130 F.3d 1265, 1267 (7th Cir. 1997); *Brownell v. Figel*, 950 F.2d 1285, 1294 (7th Cir. 1991); *Gertz v. Campbell*, 302 N.E.2d 40, 43 (Ill. 1973). So, in the event that Palay prevails on either of his other claims, he would be entitled to damages for both his original injuries and any aggravation of those injuries resulting from the manner in which the prison's medical staff treated him.

## B.  Discretionary Function Exception

Although the FTCA broadly entitles individuals to sue for injuries they suffer at the hands of negligent federal officials, Congress has exempted a variety of claims from the coverage of the statute, including "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception operates to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Gaubert*, *supra*, 499 U.S. at 323, 111 S. Ct. at 1273, quoting *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S. Ct. 2755, 2765 (1984).

In order for the exception to apply, two requirements must be met. First, as its label suggests, this exception shields the government from suit only when the complained-of act is discretionary in the sense that it "involv[es] an element of judgment or choice." *Gaubert*, 499 U.S. at 322, 111 S. Ct. at 1273, quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S. Ct. 1954, 1958 (1988). Thus, where a "federal statute, regulation, or policy

prescribes a course of action for an employee to follow" and the employee deviates from that course, his/her acts are not immune from suit. *Gaubert*, 499 U.S. at 322, 111 S. Ct. at 1273, quoting *Berkovitz*, 486 U.S. at 536, 108 S. Ct. at 1958. Second, the exception "protects only governmental actions and decisions based on considerations of public policy." *Gaubert*, 499 U.S. at 323, 111 S. Ct. at 1274, quoting *Berkovitz*, 486 U.S. at 537, 108 S. Ct. at 1959. *See also Calderon*, 123 F.3d at 949; *Grammatico v. United States*, 109 F.3d 1198, 1200-01 (7th Cir. 1997); *Maas v. United States*, 94 F.3d 291, 297 (7th Cir. 1996).

With respect to the policy requirement, applicability of the exception depends not on the intent of the government actor "but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325, 111 S. Ct. at 1275. Nor must the actor belong to the policymaking or planning ranks of government in order for the exception to apply; "[i]t is the nature of the conduct, rather than status of the actor, that governs whether the discretionary function applies in a given case." *Id.* at 325, 111 S. Ct. at 1275, quoting *Varig Airlines*, 467 U.S. at 813, 104 S. Ct. at 2764; *see also Gaubert*, 499 U.S. at 334, 111 S. Ct. at 1279. In short, "[w]hen established government policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* at 324, 111 S. Ct. at 1274.

The government contends that the decision to transfer Palay from a pretrial unit to a holdover unit housing convicted inmates reflects an exercise of discretion grounded in policy considerations. In support of that assertion, it points to the statute committing to the discretion of the Bureau of Prisons the safekeeping and care of federal inmates, 18 U.S.C. § 4042(a)(2) & (3), and to

our decision in *Calderon* invoking the discretionary function exception based in part on that statute.

In *Calderon*, we relied on section 4042 to conclude that the decisions of prison officials as to how to respond to threats against an inmate fell within the protection of the discretionary function exception. 123 F.3d at 950. The plaintiff in *Calderon* had been injured in an attack by a fellow inmate. The attack was preceded by a series of threats, which the plaintiff had reported to at least four prison officials. Nonetheless, officials had not endeavored to prevent the attack by disciplining the inmate who had threatened the plaintiff and who ultimately made good on the threats by assaulting him. We acknowledged that section 4042 on its face requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." *See id.* at 950, quoting § 4042(a)(2). However, "[t]he statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates." *Id.* We thus thought it clear from the terms of section 4042 that the prison's decision not to discipline the source of the threats against Calderon was a discretionary act and that the pertinent question was whether that decision was grounded in policy. *Id.* We rejected the plaintiff's contention that the day-to-day actions of correctional officers are not policy-based and so are outside the ambit of the discretionary function exception. "It is clear that balancing the need to provide security with the rights of the inmates to circulate and socialize within the prison involves considerations based on public policy." *Id.* at 951. The record before the court left no doubt on that score: the evidence revealed that BOP personnel in evaluating potential safety/disciplinary measures were required to consider such factors as economic feasibility, staff allocation, security concerns, and disruption of an inmate's

participation in rehabilitation programs. *Id.*; *see also Santana-Rosa v. United States*, 335 F.3d 39, 44-45 (1st Cir. 2003); *Alfrey v. United States*, 276 F.3d 557, 564-67 (9th Cir. 2002); *Cohen v. United States*, 151 F.3d 1338, 1342-43 (11th Cir. 1998); *Dykstra v. U.S.B.O.P.*, 140 F.3d 791, 796 (8th Cir. 1998).

Because prison officials also have discretion with respect to housing assignments, the government contends that its decision to place a prisoner in one unit as opposed to another falls within the discretionary function exception just as we concluded in *Calderon* that the decision whether and how to discipline one inmate for threatening another does. The government notes that it has no obligation to segregate pretrial inmates from convicted inmates. The statute governing the terms of pretrial detention states only that an order of pretrial confinement shall "direct that the person be committed to the custody of the Attorney General for confinement in a corrections facility separate, *to the extent practicable*, from persons awaiting or serving sentences or being held in custody pending appeal." 18 U.S.C. § 3142(i)(2) (emphasis added). The statute thus reflects a preference for segregation but does not demand it where impractical. The pertinent regulations employ similar language. 28 C.F.R. §§ 551.100 ("Pretrial inmates will be separated, to the extent practicable, from convicted inmates."), 551.104 ("To the extent practicable, pretrial inmates will be housed separately from convicted inmates."). Thus, the BOP is left with discretion to assess the practicability of separating pretrial detainees from those who have already been convicted. Such assessments presumably would reflect the same balancing of policy-related considerations that led us to invoke the discretionary function exception in *Calderon*.

The government certainly is correct that both the statute and the implementing regulations, although reflect-

ing a preference for segregation, leave room for prison officials to decide that separating pretrial detainees from other inmates is not practicable. Given the burdens that the growth in the prison population in recent decades has imposed on the nation's correctional centers, it would not be surprising to learn that officials at the MCC and other facilities like it have concluded that segregation is not always feasible and that pretrial detainees may be housed with other prisoners as the need arises. But with nothing more than Palay's complaint to go on, we have no idea what the BOP's or MCC's policy in fact was, or whether the official(s) who moved Palay acted in accord with that policy. For all we know, BOP/MCC policy may have prohibited such transfers or confined them to circumstances that were not present in Palay's case. Indeed, consistent with that theory, Palay predicts that the evidence will show that he had previously been transferred into the holdover unit and then returned to the pretrial unit in short order after prison officials realized that placing him in the holdover unit was a mistake (Palay Br. at 25); his complaint also characterizes his subsequent return to the holdover unit as "improper[ ]," suggesting that it was unauthorized (Complaint at 3 ¶ 11).

We also do not know whether the relevant actors were authorized to move Palay into the holdover unit. We know from *Gaubert* that the discretionary function exception is not limited to decisions made at the policy or planning level, but rather extends to decisions at the operational level that are in furtherance of governmental policy. 499 U.S. at 325, 111 S. Ct. at 1275; *see also Calderon*, 123 F.3d at 950-51. However, the decision at issue still must fall within the actor's realm of responsibility in order to qualify for the exception. As Justice Scalia pointed out in his *Gaubert* concurrence, the status of the actor matters in the sense that a decisionmaker must be charged with making policy-related judgments in order for his choices

to qualify for the discretionary function exception. 499 U.S. at 335-37, 111 S. Ct. at 1280-81 (concurrence); *see also Berkowitz*, 486 U.S. at 536, 108 S. Ct. at 1958 ("[i]n examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the acting employee").

Thus, for example, in *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S. Ct. 122 (1955), the failure of Coast Guard maintenance personnel to ensure that a lighthouse remained illuminated, which resulted in a tug and barge running aground, could not be described as an exercise in judgment entitled to protection under the discretionary function exception, because such workers were not charged with deciding what level of maintenance inspections were necessary. *See id.* at 64, 69, 76 S. Ct. at 124, 127; *see also Berkovitz*, 486 U.S. at 538 n.3, 108 S. Ct. at 1959 n.3 (distinguishing *Indian Towing* on ground that failure to keep lighthouse in working order "did not involve any permissible exercise of policy judgment); *Gaubert*, 499 U.S. at 336, 111 S. Ct. at 1280 (Scalia, J., concurring) (discussing *Indian Towing*: "though there could conceivably be policy reasons for conducting only superficial inspections [of the lighthouse], the decisions had been made by maintenance personnel, and it was assuredly not their responsibility to ponder such things").

Here, Palay points out that several provisions in the Bureau's Program Statement on the care and custody of pretrial detainees suggest that these individuals were evaluated and housed pursuant to guidelines unique to pretrial detainees, that pretrial detainees were to be housed separately from convicted inmates whenever feasible, that transfers of pretrial detainees from one housing unit to another were not to be made casually, and that the approval of upper-level managers may have been required before such a transfer occurred. *See* BOP Program Statement 7331.03 ("Pretrial Inmates") (Nov. 22,

1994) (available at <www.bop.gov> (last checked Nov. 7, 2003).[7] Thus, Palay may be able to show that the particular

———————————

[7] *See* Program Statement 7331.03 §§ 2(a) ("Each pretrial inmate will be separated to the extent practicable from convicted inmates, and where it is not practicable staff will screen and assess each pretrial inmate permitting those who do not present a risk to the orderly running of the institution to have regular contact with convicted inmates."); 2(e) ("The status of each pretrial inmate will be reviewed regularly and upon each return from court."); 8(b) (Upon intake screening of a pretrial detainee, "[u]nit staff should document an initial impression and make a recommendation for housing to the unit manager. The decision of a housing assignment for a pretrial inmate is normally not designated below the level of a unit manager. Alternate procedures may be implemented based on institution needs, only with specific written guidelines approved by the Warden."); 9(a) ("A pretrial inmate who presents a risk to the security and orderly running of the institution shall be housed where appropriate security is provided. Where practicable, separation from convicted inmates must still be maintained. At each subsequent pretrial inmate review, staff shall consider whether that inmate is appropriate for placement in less secure housing."); 9(c) ("Prior to any housing change, staff shall review SENTRY information for possible separatees or other management concerns and shall document in the inmate's file that the review was done."); 9(d) ("Because pretrial inmates are to be separated to the extent practicable from persons who are awaiting sentence, staff should verify as quickly as possible the status of a pretrial inmate who is returning from a court appearance and who had been separated from convicted inmates. . . . When staff receive official notification that a pretrial inmate has pleaded or been found guilty, the inmate is no longer regarded as 'pretrial,' and staff shall place the inmate in 'holdover' status, pending sentencing and initial designation."); 9(e) ("The Warden shall delegate responsibility for supervision of the housing area for pretrial inmates to a full-time manager or supervisor . . . ."); 12(a) ("Each pretrial inmate shall be scheduled for an initial review by the unit team

(continued...)

prison officials who transferred him into the holdover unit either lacked the authority to make the transfer and in that sense did not exercise protected discretionary judgment, or that they acted in direct contravention of BOP regulations in transferring Palay. Either way, their conduct would not be protected by the exception.

As for the broader alleged failure to protect Palay from inmate violence, we likewise cannot say that this failure necessarily arose from discretionary judgments rendered in furtherance of prison policy. Although *Calderon* makes clear that prison officials enjoy discretion in matters of inmate safety, we do not know at this juncture whether the actions (or inactions) leading up to the altercation in which Palay was injured involved judgment. Again, the government presumes that the circumstances that made the fight (and Palay's injury) possible were the result of discretionary decisions by prison officials charged with making such choices—for example, judgments about housing inmates affiliated with rival gangs in the same housing unit. Certainly that is possible. But one can also imagine that negligence having nothing whatever to do with discretionary judgments enabled the fight to break out.

The Second Circuit's decision in *Coulthurst v. United States*, 214 F.3d 106, 109-11 (2d Cir. 2000), illustrates this point. There a prisoner was injured when a cable on the weightlifting machine he was using in the prison

---

[7] (...continued)
within 21 calendar days of the inmates's first arrival at the institution, and subsequent reviews shall be conducted at least every 90 days. The initial and subsequent reviews are to assess all factors relating to the inmate's detention including the practicability of separation from convicted prisoners."); 12(d) ("Inmate reviews are to be documented on the Pretrial Inmate Review Report.").

gymnasium snapped. He filed suit contending that prison officials had been negligent in inspecting and maintaining the equipment. The district court dismissed the prisoner's complaint, relying on the discretionary function exception; but the appellate court reversed, concluding that the prison's failure to properly inspect its weightlifting equipment was not necessarily covered by the exception. The court recognized that there were potentially two types of negligence that had contributed to the failure of the equipment: negligence in the design of an inspection program for the equipment, and negligence in the actual inspection of the equipment. *See id.* at 109. The court assumed that the first type of negligence would be covered by the discretionary function exception, as it likely involved elements of judgment and choice (balancing economic, safety, and other considerations). *Id.* By contrast, one could readily imagine that an inspector's failure to carry out the inspection program with appropriate care was of a different character altogether:

> For example, the official assigned to inspect the machine may in laziness or haste have failed to do the inspection he claimed (by his initials in the log) to have performed, the official may have been distracted or inattentive, and thus failed to notice the frayed cable; or he may have seen the frayed cable but been too lazy to make the repairs or deal with the paperwork involved in reporting the damage. Such negligent acts neither involve an element of judgment or choice within the meaning of *Gaubert* nor are grounded in considerations of governmental policy.

*Id.*

As in *Coulthurst*, it is easy to imagine a scenario in which MCC officials behaved in a negligent fashion, but without making the types of discretionary judgments that the statutory exception was intended to exempt from

liability. Perhaps the corrections officer monitoring the holdover unit at the time that the gang altercation broke out was simply asleep, for example. Or perhaps he left the unit unattended in order to enjoy a cigarette or a snack. That type of carelessness would not be covered by the discretionary function exception, as it involves no element of choice or judgment grounded in public policy considerations. *Coulthurst*, 214 F.3d at 109-10; *Santana-Rosa*, *supra*, 335 F.3d at 45 (discussing *United States v. Muniz*, *supra*, 374 U.S. at 152, 83 S. Ct. at 1852); *see also Gaubert*, 499 U.S. at 325 n.7, 111 S. Ct. at 1275 n.7. Again, being at the pleading stage of the case, there is much we do not know about the circumstances that led to Palay's injury. But we cannot say that *no* set of facts consistent with Palay's complaint would entitle him to relief, and we must be able to say that before dismissing Palay's claims. *See generally*, *e.g.*, *Case v. Milewski*, 327 F.3d 564, 567 (7th Cir. 2003), citing *Hishon v. King & Spauling*, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984).

Unstated but implicit in *Calderon* is the assumption that prison officials in that case had taken note of the threats against the plaintiff in that case and weighed the relevant considerations in deciding how best to act (or not) in response to those threats. There is no hint, for example, that prison officials simply ignored the reported threats or forgot about them. Here, we lack a developed record that would permit us to decide as a matter of law whether the actions that allegedly resulted in Palay's injuries reflected the exercise of discretionary policy judgments. We have only Palay's complaint before us, and we can sustain the dismissal of that complaint only if under no set of facts consistent with that complaint could he circumvent the discretionary function exemption. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957). Because it is possible to imagine facts showing that Palay's injuries were not the result of permissible discre-

tionary judgments, he is entitled to proceed on his complaint. It remains for his claims to be fleshed out with evidence before the court can say whether the discretionary function exception applies.

## C. Proximate Cause

Under Illinois law, proximate cause consists of two elements: cause in fact and legal cause. *Evans v. Shannon*, 776 N.E.2d 1184, 1190 (Ill. 2002). Cause in fact exists when the defendant's conduct "is a material element and a substantial factor in bringing about the injury." *Id.*, quoting *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1072 (Ill. 1999). The defendant's conduct meets this criterion "if, absent that conduct, the injury would not have occurred." *Id.*, quoting *First Springfield*.

> "Legal cause," by contrast, is essentially a question of foreseeability. The relevant question here is whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct.

*Id.*, quoting *First Springfield*. Whether or not the defendant's conduct proximately caused the plaintiff's injury ordinarily is a question for the finder of fact to decide; only rarely are the facts so clear that the court can resolve the issue as a matter of law. *See Shick v. Ill. Dep't of Human Servs.*, 307 F.3d 605, 615 (7th Cir. 2002); *see also First Springfield*, 720 N.E.2d at 1071; *Felty v. New Berlin Transit, Inc.*, 374 N.E.2d 203, 205 (Ill. 1978).

Focusing first on Palay's transfer into the holdover unit, the district court questioned whether there was a causal link between that transfer and Palay's injury. The court found no reason to suppose that the gang altercation in which Palay was injured would not have broken out in the pretrial unit or that the pretrial unit was substantially less dangerous than the holdover unit. This

suggested to the court that Palay's transfer from one unit to the other was not a cause in fact of his injuries. *Palay II*, 2000 WL 1889668, at *4.

But granting Palay the inferences to which he is entitled at the pleading stage, we think it was improper to dismiss the negligent transfer claim on this basis. We do not know, in fact, whether an inmate at the MCC would have been as susceptible to injury as a result of inmate violence in the pretrial unit as he would have been in the holdover unit. Palay represents that the evidence would show that the pretrial unit at the MCC has individual cells, which have an isolating effect, while inmates in the holdover unit are housed in dormitory fashion, which logically would make the possibility of altercations greater. Palay Br. at 42. Moreover, as Palay suggests, the two populations may indeed behave differently: inmates who have not yet been convicted may strive harder to be on their best behavior. *Id.* at 43. So it is possible to imagine a set of facts which might lead a finder of fact to conclude that Palay's transfer was a material and substantial factor in the injuries that Palay received as a result of the gang fight.

Certainly there were independent acts by third parties following the transfer—including in particular the gang members engaging in the altercation and throwing the fire extinguisher—that were necessary links in the chain of causation culminating in Palay's injuries. But in Illinois the rule is that such intervening causes do not relieve a defendant of liability for its own negligence if the intervening cause itself was foreseeable. *See Felty*, 374 N.E.2d at 205, quoting *Davis v. Marathon Oil Co.*, 356 N.E.2d 93, 100 (Ill. 1976); *Neering v. Ill. Central R.R. Co.*, 50 N.E.2d 497, 504 (Ill. 1943); *see also First Springfield Bank & Trust*, 720 N.E.2d at 1072. We need not be convinced that the gang fight *was* foreseeable in order to let Palay proceed on his claims. For purposes of Rule 12(b)(6),

we need only be able to envision a set of facts in which such an incident would have been foreseeable to prison officials, and that we can do. *E.g.*, *Case*, 327 F.3d at 567.

The district court thought that Palay's injuries were unforeseeable in another respect. Recall that the fighting gang members did not strike Palay directly. Instead, one of them threw a fire extinguisher, the extinguisher struck Palay's bed and discharged into his face, and the discharge caused Palay to awake in a start, sit up suddenly, and strike his head on the bunk above him. In the district court's view, the peculiar path to Palay's injury was not reasonably foreseeable, so that even if the MCC caused Palay's injury in fact by transferring him into the holdover unit or by otherwise failing to protect him from violence, the MCC's alleged negligence was not the legal cause of his injuries. *Palay I*, 125 F. Supp. 2d at 863; *Palay II*, 2000 WL 1889668, at *4.

But under Illinois law, so long as the defendant could have foreseen that his negligence would result in some type of injury, the precise nature or method of injury need not have been foreseeable. *Enis v. Ba-Call Bldg. Corp.*, 639 F.2d 359, 362 (7th Cir. 1980) (applying Illinois law); *Neering*, 50 N.E.2d at 503; *Colonial Inn Motor Lodge, Inc. v. Gay*, 680 N.E.2d 407, 413 (Ill. App. Ct. 1997). So all we need ask at this stage of the litigation is whether it is conceivable that Palay could establish that it was foreseeable to the BOP that, as a result of transferring him into the holdover unit or more generally by failing to prevent an outbreak of violence, he would suffer an injury. The answer to that question is plainly yes.

Whatever obstacles Palay may encounter in attempting to establish that MCC's allegedly negligent acts or omissions proximately caused his injuries, we cannot determine from the face of his complaint that under no set of facts could he surmount them. He is entitled to proceed

with discovery and marshal evidence in support of his claims.

### III.

The district court's judgment is AFFIRMED IN PART and REVERSED IN PART. For the reasons we have discussed, we conclude that the district court properly dismissed Palay's claim for inadequate medical care. The court erred, however, in dismissing his negligent-reassignment and failure-to-protect claims. We thank Palay's appointed attorneys for their service on his behalf.

A true Copy:

     Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
