In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-1489

ROY SYLVESTER PARROTT,

*Plaintiff-Appellant*,

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 2:03-cv-00026—**Richard L. Young**, *Judge*.

———————

ARGUED SEPTEMBER 19, 2007—DECIDED JULY 30, 2008

———————

Before BAUER, MANION, and WOOD, *Circuit Judges*.

WOOD, *Circuit Judge*. This appeal marks this court's second encounter with Roy Sylvester Parrott. On July 11, 2001, Parrott, then incarcerated at the U.S. Penitentiary in Terre Haute, Indiana, was stabbed 22 times in the face, head, and arm by another inmate, Kenneth Gregory. As a result of the attack, Parrott suffered serious lacerations to his forehead, ear, shoulder, and eyes. Shortly after his release from the hospital some two weeks later, Parrott was in the process of being transferred to Wallens Ridge, a state prison in Virginia. Though Parrott eventually

made it to the new institution, his personal property did not. Instead, Bureau of Prisons ("BOP") staff at the Terre Haute institution sent Parrott's property to his sister, who lives in the Virgin Islands and who, because of the policies at Wallens Ridge, is now forbidden to send Parrott's property back to him. BOP insists that Parrott instructed its staff to ship the property to his sister. Parrot retorts that he did no such thing. Because prison officials at Terre Haute negligently mishandled his property and sent it away without his permission, Parrot argues, it is now lost to him for good.

These events prompted Parrott to sue the United States and several BOP employees under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-2680, for (1) failure to protect him from being attacked by another inmate, and (2) negligent handling of his personal property. The district court dismissed the United States and several individual defendants after pre-screening the complaint under 28 U.S.C. § 1915A, and then it granted summary judgment in favor of the remaining defendants. Parrott appealed, and this court held that the claims against the individual employees were properly dismissed, but that those against the United States should have been retained. We thus sent the case back to the district court for further proceedings on Parrott's FTCA claims against the United States. See *Parrott v. Gehrke*, 103 F. App'x 908 (7th Cir. 2004) (*Parrott I*).

The remand resulted in a grant of summary judgment against Parrott on both of his claims. In addition to challenging that ultimate decision on appeal, Parrott, who represented himself *pro se* throughout the district court proceedings, also argues that the district court erred when it denied various discovery motions. Parrott asserts

that the district court's handling of discovery provides an independent basis for reversal, particularly on the failure-to-protect claim. We agree with him, and we therefore remand the case to the district court once again for further discovery on the question whether BOP officials negligently failed to protect Parrott from Gregory's assault.

## I

Because this case reaches us on summary judgment for the United States, we construe the facts and draw all inferences in the light most favorable to Parrott. *Steen v. Myers*, 486 F.3d 1017, 1021 (7th Cir. 2007). Parrott's term of incarceration at the federal prison in Terre Haute began in May of 1997. As we noted in *Parrott I*, his claims arise from two separate events. First, on July 11, 2001, as Parrott was working in the kitchen with Kenneth Gregory, his former cellmate, Gregory attacked Parrott with a kitchen knife and inflicted multiple stab wounds to Parrott's face, head, arms, and chest. This assault was, unfortunately, predictable in light of the bad blood that had existed between Parrott and Gregory for at least a year. The two became cellmates on January 17, 2000, sharing quarters in the Prison's Special Housing Unit ("SHU"), to which inmates are assigned for disciplinary segregation and administrative detention. During their time as cellmates, Gregory happened to learn the name and address of Parrott's ex-girlfriend, Jennifer Mechling. A few months later, Gregory was assigned to a different cell. From there, armed with Mechling's contact information, Gregory began to write harassing letters to her. Parrott learned of these letters in April of 2000 and complained to BOP at that time.

Within a couple months of Parrott's complaint to BOP about Gregory, the Prison placed the two former cell-mates in a recreation area together. (The record is not clear on the details of inmates' recreation time, but it suggests that such time is strictly regimented, and that some prisoners remain completely isolated, while others are permitted to share the "recreation cage" with other inmates.) As prison officials removed Parrott's restraints, Parrott began to strike Gregory, who remained in cuffs and therefore did not strike back. Prison officials quickly intervened to separate and restrain both men, neither of whom was injured in the incident, and neither of whom was disciplined as a result of the confrontation.

That same date, June 7, 2000, Terre Haute Warden Harley G. Lappin prepared a "Report of the Incident," describing the altercation between Parrott and Gregory and the Prison's response to it. Though the Government eventually, after repeated requests from Parrott, produced two versions of this report during the proceedings below, both versions are heavily redacted. (Indeed, more has been removed than has been left for review.) They indicate that the inmates involved in the incident were placed in separate cells following the confrontation, and they also reflect that Parrott's "CIMS Category" was "Separation." ("CIMS" refers to BOP's Central Inmate Monitoring System. See 28 C.F.R. §§ 524.70-76. We explain the significance of "Separation" status in a moment.) The report reflected that it was to be placed in the "Inmate Central File" and noted that the incident was, at the time the report was made, under further investigation. In both versions of the report that are in the record, any and all information about Gregory has been redacted by BOP.

Because of the redactions, all we can infer is that Parrott was to be separated from someone; there is no way to tell

from whom. According to the relevant regulations, a CIMS classification of "Separation" designates "[i]nmates who *may not* be confined in the same institution (*unless* the institution has the ability to prevent any physical contact between the inmates concerned) with other specified individuals" in federal custody. 28 C.F.R. § 524.72(f) (emphasis added). Thus, if at the time prison staff placed Parrott and Gregory together in the recreation area the two were on separation status from each other, then the Terre Haute officials violated BOP's own regulations and orders. We do not know whether this was the case, for BOP redacted that information from the reports provided to Parrott, and the district court refused either to compel the production of a non-redacted version or even to view the full report *in camera* to see if it revealed, as Parrott suspects, that Gregory was indeed the "specified individual" referenced in Parrott's separation order.

After the June 7, 2000, dust-up, Parrott remained in the SHU until July 5, 2001, when he was returned to the Prison's general population. There is some dispute over the question whether, at that time, Parrott signed a statement indicating that he wished to return to the general population and had no concerns regarding that return, and purporting to release prison staff from liability in the event that Parrott was "killed or injured" as a result. Parrott denies signing such a document, and further argues that the alleged waiver would be ineffective to relieve BOP of liability even if he had signed something. BOP takes the opposite position, but since the dispute over signing is a question of fact, we must assume at this stage that Parrott signed no such thing. Parrott did not know at the time of his release that Gregory, too, was back in the general population.

Parrott certainly found out no more than six days later, on July 11, 2001, that Gregory was back in circulation. On that day, the Prison assigned Parrott and Gregory to the same work detail in the kitchen, and Gregory's attack occurred. The record contains photographs taken after the incident. These show the extent of Parrott's wounds, which included a half-inch gash in the center of his head, and deep cuts above his left eye. Parrott was hospitalized for approximately two weeks following the incident. Also after the incident, BOP Special Investigative Assistant Terry Coleman prepared an Investigative Report dated August 2, 2001, for Warden Lappin; Coleman's report confirmed that the separation order previously in effect (as indicated on Lappin's June 7, 2000, report) remained in place at the time of the kitchen assault on July 11, 2001. Coleman's report does not, however, mention from whom Parrott was to be kept apart.

The incident that underlies Parrott's property claim occurred shortly after his release from the hospital. Under an agreement between the U.S. Department of Justice and the Virgin Islands Department of Corrections, Parrott and several other federal prisoners were scheduled for transfer to Wallens Ridge Correctional Facility, a non-federal institution in the state of Virginia. On July 25, 2001, prison staff brought Parrott and his personal belongings to Terre Haute's receiving and discharge area, where he was to be processed for transfer. At this time, prison employee Stephen Girton took an inventory of Parrott's property and advised Parrott (wrongly, as it turned out) that restrictions at Wallens Ridge prevented the Terre Haute prison officials from shipping all of Parrott's belongings to the new facility. The basis for Girton's advice was a memorandum from Dwayne R. Dubbs, BOP's Inmate Transportation Coordinator, sent on July 13, 2001 (the

"Dubbs Memo"), which advised BOP staff in Terre Haute that certain types of personal property were not permitted in Wallens Ridge. The Dubbs Memo listed the names of the prisoners to be transferred and stated that "Wallens Ridge has a strict personal property policy and does not allow personal clothing with the exception of the items identified below. Hobby craft items, nail clippers, and small scissors are not authorized." Directly below that paragraph was the list of permitted personal clothing items:

> One pair of shower shoes
>
> Six pairs of white athletic shorts
>
> Six white undershirts or T-shirts with sleeves / no pockets
>
> Six pairs of white boxer shorts
>
> Six handkerchiefs, white
>
> One baseball cap, blaze orange

The Dubbs Memo did not list any other restrictions on the personal property of prisoners being transferred to Wallens Ridge, nor did it instruct BOP personnel how to handle the transfer of inmates' personal property. In fact, BOP has a protocol for property transfers. Its written policy instructs the responsible official to ship both authorized and unauthorized personal property to the institution receiving the transferred prisoner and specifies that "[i]f the inmate's personal property is not authorized for retention by the receiving institution, staff at the *receiving* institution shall arrange for the inmate's excess personal property to be mailed to a non-Bureau destination of the inmate's choice." 28 C.F.R. § 553.14(b) (emphasis added).

Girton's affidavit states that "inmates at Wallens Ridge are severely limited in the amount of allowable items

they can possess. For example, excess clothing, electronics, personal items, books, and other non-listed items were not to be shipped directly to the prison with the inmate." As Parrott points out, Girton's statement classifies far more items as "prohibited" than the Dubbs Memo does. Indeed, the inventory forms contained in the record demonstrate that the vast majority of Parrott's items (*e.g.*, batteries, books, legal materials, letters, a ballpoint pen, personal papers, photos, dental floss, deodorant, hair oil, soap, soap dish, a hairbrush/pick, Noxema, shampoo, shave bag, eyeglasses, eyeglass case, a Sony radio, a cup, a bowl, a laundry bag, and two address books) were *not* included on the Dubbs Memo's list of items prohibited at Wallens Ridge. Though it seems Parrott did possess some prohibited items (*e.g.*, FILA tennis shoes, three pairs of sweat pants, two sweat shirts, clippers) and a few things that may or may not have passed Wallens Ridge's restrictions (three T-shirts, one pair of underwear), nearly all of the items in his three boxes of possessions, which contained all that he owned, were permissible under the Dubbs Memo.

After Girton told Parrott (inaccurately) about how little could be sent on to Wallens Ridge, Girton reported that Parrott said "screw it, just send all my stuff to this address." The address, Girton stated, was that of Parrott's sister, who lives in the Virgin Islands. Interpreting this as an instruction, Girton proceeded to ship all three boxes of Parrott's property—again, everything that he owned—to the Virgin Islands.

Parrott recalls things differently: he denies instructing Girton to send his belongings to his sister. While the Government insists that Parrott provided her address on the inventory forms and signed the receipts directing

his property to his sister's address, he says that his personal copies of the forms do not include his sister's name or address. Moreover, he asserts that even if he did provide his sister's address, that would not negate BOP's negligence in providing incorrect information about the property restrictions at Wallens Ridge. Because of this negligence, Parrott argues, he has been deprived forever of his personal property, even though the boxes did reach his sister in the Virgin Islands. Wallens Ridge would have accepted the property in a direct transfer from the federal prison, but (like many prisons) it tightly restricts the sources from which inmates may receive *new* items. Operating procedures at Wallens Ridge provide that "[p]ersonal property may not be received by mail or delivery service from any source other than an approved mail order vendor. Property may not be received from visitors or any other source." Va. Dep't of Corrections Division, Operating Procedure 856-7.7, quoted at http://www.vadoc.virginia.gov/offenders/prison-life/faqs.shtm (last visited July 1, 2008). Parrott's sister is obviously not on the approved list of senders. Thus, Parrott cannot receive his property even if she tries to send it to him. Because he is serving a life sentence, it is highly unlikely that he will ever be able to receive it elsewhere or to go and retrieve it.

## II

Before moving to the merits, we must resolve a jurisdictional question: whether the statutory exceptions to the FTCA's waiver of sovereign immunity found in 28 U.S.C. § 2680 limit the subject-matter jurisdiction of the federal courts. See *Palay v. United States*, 349 F.3d 418, 424 (7th Cir. 2003) (citing *Clark v. United States*, 326 F.3d

911, 913 (7th Cir. 2003)). The issue arises because the statute conferring jurisdiction over claims against the United States, 28 U.S.C. § 1346, gives exclusive jurisdiction to the federal courts in tort actions "[s]ubject to the provisions of chapter 171 [Tort Claims Procedure]," and § 2680 is found in chapter 171. Two of the exceptions noted in § 2680 are involved in this case: the discretionary function exception, § 2680(a), and the detention of goods exception, § 2680(c). In its Statement of Jurisdiction, the Government seems to claim that these are exceptions to the jurisdictional grant, not to the scope of the right to recover. Although it does not develop this point in its brief, we must reach it nonetheless, because it implicates the court's competence to rule on the case.

Section 1346(b) is subject to chapter 171 in its entirety, not to § 2680 specifically. Chapter 171 covers a great deal of ground: it defines various terms, § 2671; it establishes rules for administrative adjustment of claims, § 2672; it requires exhaustion of administrative remedies, § 2675; it stipulates that the remedies it contains are exclusive, § 2679; and it carves out exceptions to its coverage, § 2680. One could not find the exceptions of § 2680 to be jurisdictional without at the same time giving jurisdictional status to the remainder of these provisions, including the exhaustion rule. This result, however, would be inconsistent with the way that the Supreme Court has treated filing rules in the analogous context of a lawsuit claiming employment discrimination by a federal agency. See *Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89, 93-96 (1990); see also *McNeil v. United States*, 508 U.S. 106, 112 (1993) (discussing the Federal Tort Claims Act's rules as setting up prerequisites to suit, not jurisdictional barriers). As we wrote in *United States v. Cook County*, 167 F.3d 381

(7th Cir. 1999), "what sovereign immunity means is that relief against the United States depends on a statute; the question is not the competence of the court to render a binding judgment, but the propriety of interpreting a given statute to allow particular relief." *Id.* at 389. That principle resolves this jurisdictional debate, too. The statutory exceptions enumerated in § 2680(a)-(n) to the United States's waiver of sovereign immunity (found in § 1346(b)) limit the breadth of the Government's waiver of sovereign immunity, but they do not accomplish this task by withdrawing subject-matter jurisdiction from the federal courts. Compare *Frey v. EPA*, 270 F.3d 1129, 1132-33 (7th Cir. 2001) (differentiating between provisions that affect a federal court's competence to adjudicate cases under Article III, thereby limiting its subject-matter jurisdiction, from those that merely set limits on a plaintiff's ability to obtain relief). It is the Government's burden to assert these exceptions if and when it seeks to defeat a claim because of them. We thus have jurisdiction to decide whether Parrott is entitled to proceed with either or both of his claims.

### III

The FTCA waives the Government's sovereign immunity only "under circumstances where . . . a private person . . . would be liable" under applicable state tort law. 28 U.S.C. § 1346(b)(1). Each of Parrott's claims therefore requires him to satisfy Indiana tort law by showing: (1) a duty owed to the plaintiff by the defendant; (2) the defendant's breach of the duty by failing to meet the appropriate standard of care; and (3) injury to the plaintiff caused by the defendant's failure to perform its duty. See *Iglesias v. Wells*, 441 N.E.2d 1017, 1019 (Ind. App. Ct. 1982) (citing *Miller v. Griesel*, 308 N.E.2d 701, 706 (Ind. 1974)).

A

We begin with Parrott's claim that BOP officials negligently mishandled his property. This claim is governed by the Supreme Court's recent decision in *Ali v. Federal Bureau of Prisons*, 128 S.Ct. 831 (2008). *Ali* involved the interpretation of § 2680(c), which provides that the general waiver of sovereign immunity found in the Federal Tort Claims Act does not apply to claims arising from the detention of property by "any officer of customs or excise or any other law enforcement officer." The question in *Ali* was whether the quoted phrase applies only to law enforcement officers enforcing customs or excise laws, or if it applies literally to "all" law enforcement officers. The Court found the latter interpretation more consistent with the language of the statute and dismissed the claim of a federal prisoner whose personal effects had been lost by BOP. In so doing, it rejected the narrower reading that this court had adopted in *Ortloff v. United States*, 335 F.3d 652, 658 (7th Cir. 2003), and reaffirmed in *Dahler v. United States*, 473 F.3d 769, 772 (7th Cir. 2007).

On the surface, it would be hard to find a ruling from the Supreme Court more directly on point. In a last-ditch effort to avoid dismissal of his property claim on this ground, Parrott suggests that we might hold that § 2680(c) does not immunize the BOP officials in his case because they did not "detain" the property at issue. Noting that the exception applies only when a petitioner's property is "detained," Parrott points out that *Ali* did not speak to the issue of what counts as the "detention" of a prisoner's property for purposes of triggering this exception to the abrogation of sovereign immunity. See *Ali*, 128 S.Ct. at 835 n.2 (assuming, "without deciding, that the BOP officers 'detained' Ali's property and thus satisfy § 2680(c)'s

'arising in respect of . . . detention' requirement," because the "Court of Appeals held that the 'detention' clause was satisfied," and because Ali "expressly declined to raise the issue on certiorari").

As Parrott sees it, there is a difference between "detention" of property and "loss" of property, and while there may be an exception to the Tort Claims Act for the former, there is not for the latter. Apart from making a waiver argument that we find ill-founded, given the fact that *Ali* overruled this circuit's position, and it was not decided until after the briefs were filed in this court, the Government suggests that the district court has already resolved this issue in its favor, by finding on the record that Parrott's property was "detained" within the meaning of § 2680(c). It is correct. In the district court's Entry Discussing Motion for Summary Judgment, it expressly stated that "the forwarding of personal property such as that which occurred in this case was a 'detention' of goods or other property." While the court provided no explanation for its conclusion, we find it consistent with the normal meaning of "detention." The BOP officials took all of Parrott's property, inventoried it, and erroneously told him that he would not be permitted to have it shipped to the new prison. They then forwarded his belongings to his sister in the Virgin Islands, who now is unable to send them back to Parrott. At no time has Parrott's property been lost; it was instead detained first (that is, kept by BOP officials) and then shipped to the custody of a different person.

This court has not previously had occasion to tackle the question what constitutes a "detention" for purposes of § 2680(c). Our sister circuits, however, have looked at problems similar to Parrott's. The Tenth Circuit, for

example, has held that "§ 2680(c) applies where a prisoner alleges that defendant prison officials detained his personal property and mailed it outside the prison." *Hatten v. White*, 275 F.3d 1208, 1210 (10th Cir. 2002). That is precisely what happened to Parrott. In *Hatten*, as in this case, prison officials relied on a new policy that reduced the amount of personal property that inmates could retain. *Id.* at 1209-10. The only difference between *Hatten* and Parrott's case is that in *Hatten* the "new" policy was implemented at Hatten's current prison, while in this case the shift to a new institution brought a new policy into play. The result was the same: prison officials in each case mailed the respective inmate's "excess" (that is to say, prohibited) belongings outside the prison. In each case, the inmate lost access to his property. But lost *access* to property is not the same as lost property.

We agree with the Tenth Circuit that confiscation followed by sending property to a known recipient is a "detention" for purposes of the exception set forth in § 2680(c). Indeed, a number of other circuits have held that even where the negligent actions of law enforcement officers lead to the complete destruction of the property, § 2680(c) applies to bar the suit. See *United States v. Bein*, 214 F.3d 408, 415-16 (3d Cir. 2000); *Cheney v. United States*, 972 F.2d 247, 248-49 (8th Cir. 1992); *Attallah v. United States*, 955 F.2d 776, 786 n.16 (1st Cir. 1992); *Schlaebitz v. U.S. Dep't of Justice*, 924 F.2d 193, 194 (11th Cir. 1991) (*per curiam*). Similarly, some circuits have held that officers' actions of "seizing" property falls within the scope of the exception. See, *e.g.*, *Jeanmarie v. United States*, 242 F.3d 600, 604 (5th Cir. 2001); *Gasho v. United States*, 39 F.3d 1420, 1433 (9th Cir. 1994).

Parrott's property claim is therefore barred by the exception to tort liability found in § 2680(c) for claims

arising out of "the detention of any goods, merchandise, or other property by . . . any other law enforcement officer."

B

We turn now to Parrott's claim that prison staff negligently failed to protect him from Gregory's assault. Parrott first must establish that the defendants had such a duty in the circumstances that arose. The parties agree that a duty was owed to Parrott in this case, and that 18 U.S.C. § 4042 accurately states that duty. See *United States v. Muniz*, 374 U.S. 150, 164-65 (1963) (holding that "the duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042"). Section 4042 reads, in pertinent part, as follows:

> The Bureau of Prisons . . . shall—
>
> (1) have charge of the management and regulation of all Federal penal and correctional institutions;
>
> (2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;
>
> (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States . . . .

§ 4042(a)(1)-(3). Under *Muniz* and subsequent cases that have interpreted it, § 4042 describes a duty of care for persons in federal custody. (To the extent that the FTCA requires us to assess the Government's duty under Indiana law, we note that there is no hint that Indiana law would differ on this point.) That duty includes the "safe-

keeping" and "protection" of all such persons. Applicable state tort law (here, the law of Indiana) governs whether the duty was breached and whether the breach was the proximate cause of the plaintiff's injuries. See *Molzof v. United States*, 502 U.S. 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law."); *Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1297 (7th Cir. 1991) ("[T]he FTCA incorporates the substantive law of the state where the tortious act or omission occurred . . . .").

At the first stage of this analysis, we confront the problem that § 4042 is written in very general terms. As we noted in *Calderon v. United States*, 123 F.3d 947 (7th Cir. 1997), although "this statute sets forth a mandatory duty of care, it does not, however, direct the manner by which the BOP must fulfill this duty. The statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates." *Id.* at 950. The district court took the position that Parrott had to show that the correctional officers "knew of a potential problem between the two inmates prior to the assault." In fact, the standard is broader: as Parrott argues and the Government concedes, Parrott must show only that BOP staff knew *or reasonably should have known* of a potential problem between the two inmates. See *Brown v. United States*, 486 F.2d 284, 288-89 (8th Cir. 1973) (analyzing United States's liability under the FTCA, in a federal prisoner's failure-to-protect suit, in terms of what "the federal government knew or reasonably should have known"); Restatement (2d) of Torts § 314A cmt. e.

The fact that the district court made no findings about what the prison officials should have known about the

risks of placing Parrott on the same work detail as Gregory on the day of the stabbing incident may be enough on its own to warrant a remand for further proceedings. Beyond that, however, we find that Parrott succeeded in demonstrating that there were disputed issues of material fact. As we noted earlier, the Incident Report of June 7, 2000, reflected the fact that Parrott's CIMS Category on that date was "Separation." Though the identity of the individual from whom Parrott was separated has been redacted on the versions of the Report in the record, Parrott argues persuasively that the evidence that does exist supports an inference that it was Gregory. The Government's unsupported statement that it was not Gregory is not enough to resolve this dispute conclusively in its favor. Furthermore, if a formal separation order was in effect between Parrott and Gregory prior to Gregory's July 11, 2001, assault on Parrott, then a trier of fact could reasonably infer that BOP staff knew or should have known of a potential problem between Parrott and Gregory. BOP's own regulations require its employees to "prevent any physical contact" between specified separated individuals, 28 C.F.R. § 524.72(f), and so the existence (or absence) of such an order is of central importance. Nothing in the record suggests that Parrott's separation status was modified between the June 7, 2000, report and the stabbing incident on July 11, 2001. Quite the contrary: an investigatory report filed on August 2, 2001 (detailing the July 11, 2001, attack), confirms that Parrott's Central Inmate File continued to reflect a CIMS classification of "Separation" at the time Gregory assaulted Parrott in the prison kitchen.

We are sympathetic to the Government's point that BOP regulations prohibit officials from telling inmates the identity of others from whom they are separated. This

concern could have been accommodated, however, either by an examination of the unredacted materials *in camera*, or by a grant of one of Parrott's three motions for appointment of counsel, so that counsel could have examined the record. If it turns out that BOP failed to enforce its own classification decision, Parrott would be able to escape the force of the "discretionary function" exception to tort liability found in § 2680(a). Under that provision, the FTCA's general waiver of sovereign immunity does not apply where the challenged act involves "an element of judgment or choice" and is "susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 322, 325 (1991). As long as a valid separation order is in effect, there is no discretion left to operate on that narrow question. Compare *Calderon*, 123 F.3d at 949-50 (holding that BOP officials' decision *whether* to separate inmates is discretionary), with *Cohen v. United States*, 151 F.3d 1338, 1344-45 (11th Cir. 1998) (finding that even though the decision whether to classify inmates is discretionary, the violation of a mandatory guideline implementing discretionary policies " 'will be no shelter from liability because there is no room for choice and the action will be contrary to policy' " (quoting *Gaubert*, 499 U.S. at 324)); see also *Palay*, 349 F.3d at 431 (concluding that the discretionary-function exception does not apply where prison officials have "acted in direct contravention of BOP regulations"). The discretionary-function argument is one that the Government did not raise until its opening brief on appeal, and thus we could, if we wished, treat it as forfeited. Given the importance of sovereign immunity, however, we have chosen to address the merits.

Part of the problem here is the fact that Parrott was *pro se* in the district court, and his efforts to pursue discovery

were thwarted at every turn. Parrott handwrote all of his pleadings, meticulously setting forth his arguments (even *Bluebook*ing his citations with a skill that many law students would envy). But when he had to move beyond writing to the pursuit of evidence, he was stymied. The Government objected to nearly all of Parrott's discovery motions by asserting that the information he requested was either privileged, or irrelevant, or both. Whether or not those conclusions were accurate, they turned out to be immaterial. In denying Parrott's motions, the district court relied (inappropriately) on rules of admissibility and generalized concerns about privacy and confidentiality, rather than on the basis of discoverability. Once again, a more targeted consideration of the requested materials would have been preferable. Because so much of this case hinges on whether a formal separation order existed between Parrott and Gregory, we find that the district court abused its discretion in its handling of Parrott's discovery motions, and that Parrott suffered substantial prejudice as a result.

**IV**

For these reasons, we AFFIRM the district court's judgment in favor of the United States on Parrott's property claim. We VACATE the summary judgment order on Parrott's failure-to-protect claim and REMAND the case for further proceedings consistent with this opinion. Each side must bear its own costs on appeal.

BAUER, *Circuit Judge*, concurring in part and dissenting in part. I join the excellent opinion of the majority as to the property claims; I respectfully dissent from that portion of the opinion that remands the issue of the "separation" order and its implications.

As the district court held, Parrott has failed to demonstrate any basis for concluding that prison officials acted in negligent disregard of such risks when they released him into the general prison population. Parrott was released from the Special Housing Unit on July 5, 2001, at his request, over a year after a minor altercation that he had instigated with Gregory in which no one was injured. *See* RE 99-9 at 2, SA 35; RE 99-10 at 2, SA 37; RE 107-3 at 6, SA 83. Parrott has pointed to no threats or other reasons that the BOP would reasonably have suspected that releasing him into the general population would result in his harm at the hands of Gregory. Rather, as the district court held, "[t]he evidentiary record here contains no feature or fact suggesting that BOP staff knew of a potential problem between Parrott and Gregory on July 11, 2001" such that Parrott could not be released into the general population. RE 117 at 3, SA 118.

Indeed, Parrott signed a statement indicating that he had no concerns regarding his return to the general population and did not fear for his safety. RE 99-9 at 2, SA 35; RE 99-10 at 2; SA 37 (requesting "to remain housed in General Population as there is no need for staff to protect me at this time" and agreeing to notify BOP staff if threats arise). Although Parrott suggests that he did not sign this statement, *see* BR. 36, nothing in the record provides the basis for a genuine factual dispute and Parrott cannot resist summary judgment on the basis of "mere allegations or denials." Moreover, the records

before the district court contain statements by two BOP officials that no order existed that required the separation of Parrott and Gregory.

Without any basis that I can see in the record, Parrott insists that the redacted file (which the Court properly held was not available as discovery material) showed otherwise. The majority opinion, while professing sympathy for the BOPs regulations that prevent them from disclosing the contents of the file, says the concern could have been accommodated by either the court (or a court appointed counsel) reviewing the redacted material to see if the BOP officials were lying. Leaving out the fact that I knew of no requirement that the court should appoint an attorney in a case that raises the issues we face, the trial court concluded that such a study was unnecessary; that the record shows that nothing Parrott raised produced enough of a question that required further discovery.

Nothing in the record shows that the BOP was aware of any reason to separate Parrott and Gregory. There was a minor altercation between the two; in a prison population such altercations are frequent, not unexpected and virtually impossible to prevent. If they all led to Separation orders, the prisons would occupy half the state.

I think Judge Young had it right; the defendants were entitled to summary judgment on both facets of the case.