In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3775

KRISTINE BUNCH,

*Plaintiff-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:14-cv-438-WTL-DKL — **William T. Lawrence**, *Judge.*

ARGUED SEPTEMBER 7, 2017 — DECIDED JANUARY 30, 2018

Before WOOD, *Chief Judge*, and BAUER and SYKES, *Circuit Judges*.

WOOD, *Chief Judge*. Kristine Bunch spent 17 years in an Indiana prison based on a state conviction for the murder of her son. Bunch's conviction rested on testimony and evidence apparently fabricated by a federal forensic chemist, William Kinard. Kinard's conduct came to light during post-conviction proceedings in Indiana's courts, prompting the Indiana Court of Appeals to reverse her conviction. The

Indiana Supreme Court later denied transfer. With the criminal conviction wiped out, Bunch became free to seek some recompense for the wrongful conviction and years of liberty she lost. She is attempting to do so in this suit.

At the time of Bunch's wrongful conviction, Kinard was a forensic chemist with the federal Bureau of Alcohol, Tobacco, and Firearms (ATF). Bunch therefore sued the United States as his employer, invoking the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671–80. That suit was consolidated with a separate action Bunch brought against two Indiana state fire marshal investigators under 42 U.S.C. § 1983. With respect to the suit against the United States, the district court concluded that the intentional-tort exception to the general waiver of immunity found in the FTCA applied. It also ruled that the exception to that exception for torts committed by investigative or law-enforcement officers did *not* apply, and on that basis it granted summary judgment in the United States's favor. With that work done, the court certified under Federal Rule of Civil Procedure 54(b) that the suit against the United States was fully resolved and that there was no just reason to delay an appeal.

It may well be, in the final analysis, that the intentional-tort exception precludes suit against the United States. But the record was not developed fully enough in the district court to support such a conclusion at this stage. We do not sit as triers of fact, and so it would be improper for us to supervise the collection of further evidence. We conclude that summary judgment was premature and that further proceedings must occur in the district court before the immunity issue can finally be resolved.

**I**

Bunch's travails began when a fire consumed her home and claimed the life of her three-year-old son on June 30, 1995. Two investigators from the Indiana Fire Marshal's office, Bryan Frank and James Skaggs, quickly decided that arson had caused the fire and that Bunch was the arsonist. They sent samples from Bunch's home to ATF for testing. It fell to Kinard, an ATF forensic chemist and gunshot-residue analyst-specialist, to analyze the samples. His results did not confirm Frank and Skaggs's theory. To the contrary, his draft report stated that no accelerants were present in the two places where the Indiana investigators thought the fire had begun: the boy's bedroom and a spot in the living room. Although samples from elsewhere in the house tested positive for heavy petroleum distillates, Kinard concluded that these results were "consistent with the presence of kerosene, for which there was an innocent explanation."

This was not what Frank and Skaggs wanted to hear. Bunch alleges that they communicated their disappointment to Kinard, who agreed to fabricate findings in his official report. He apparently did just that: the official report confirmed the presence of accelerants in the two locales identified by the Indiana investigators. It also said that the heavy petroleum distillates were consistent with the presence of a broad array of chemicals, many of which were highly suspicious. The Indiana investigators submitted only the final, official, version of Kinard's report to the state prosecutors, and Kinard's trial testimony stuck to that version. No one revealed the existence of the draft report to Bunch, nor did anyone alert her to the dramatic shift in Kinard's conclusions.

In 1996 an Indiana jury convicted Bunch of felony murder, and the court sentenced her to 60 years' imprisonment. As the Indiana Court of Appeals later noted, "no witness testified to seeing Bunch set the fire or hearing her talk about doing so; there was no evidence Bunch had purchased a liquid accelerant and no evidence of flammable liquid on the clothes she was wearing; and there was no testimony regarding a motive for her setting the fire." *Bunch v. State*, 964 N.E.2d 274, 280 (Ind. Ct. App. 2012). Thus, "[t]he State's case relied largely on expert testimony describing two points of origin for the fire from visual inspection and testing of floor samples showing evidence of a liquid accelerant." *Id*. In other words, Bunch asserts, the state relied on the testimony of Frank and Kinard, bolstered by Kinard's falsified report.

Bunch filed a petition for post-conviction relief in 2006. In the course of those proceedings, Kinard's draft report came to light. The Indiana Court of Appeals reversed Bunch's conviction, holding that the state's failure to produce the draft report had violated *Brady v. Maryland*, 373 U.S. 83 (1963). *Bunch*, 964 N.E.2d at 304. In addition, the court held that significant advances in the science of fire-victim toxicology independently justified granting post-conviction relief. *Id*. After the Supreme Court of Indiana denied the state's petition to transfer, Indiana declined to retry Bunch.

At that point Bunch sued the United States under the FTCA because Kinard was acting within the scope of his federal employment when he prepared the reports. She raised claims of both malicious prosecution and intentional infliction of emotional distress arising out of the malicious prosecution. As we noted, the district court later consolidated this suit with her separate section 1983 action against Frank and

Skaggs. The court ultimately resolved her FTCA suit with its decision that the United States is entitled to sovereign immunity. Its entry of summary judgment for the United States and order under Rule 54(b) permit this immediate appeal.

## II

We review the district court's grant of summary judgment for the United States *de novo*. *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017). Summary judgment is proper when the moving party—here the United States—"shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party that bears the burden of proof for an issue at trial must "cite the facts which it believes [would] satisf[y]" that burden and "demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant … ." See *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

Through the FTCA, the United States has assumed liability for its employees' torts as if it were a private employer. 28 U.S.C. §§ 1346(b)(1); 2674. This broad waiver of immunity, however, is subject to several qualifications, some of which appear in section 2680. Bunch's case depends on the FTCA's regime for intentional torts—specifically those arising out of malicious prosecution—for which the United States has reserved sovereign immunity *unless* they stem from the conduct of "investigative or law enforcement officers." *Id.* § 2680(h). The statute defines the term "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id*. Although such an officer must act within the scope of his or her employment,

the tort need not arise while the officer is performing one of the three enumerated activities. *Millbrook v. United States*, 569 U.S. 50, 55 (2013). Rather, the waiver of sovereign immunity holds so long as the tortfeasor is empowered to search, seize evidence, or arrest. *Id.*

Bunch has raised a claim of intentional infliction of emotional distress arising out of malicious prosecution and a stand-alone claim of malicious prosecution. If the intentional-tort exception bars one, it bars the other as well, and so we analyze them together. See *United States v. Shearer*, 473 U.S. 52, 54–56 (1985). It is undisputed that Kinard acted within the scope of his employment when he tested the forensic samples and drafted the reports stating his conclusions. This leaves only the question whether Kinard was "empowered by law" to search, seize evidence, or arrest.

Bunch has fulfilled her duty to put forth evidence sufficient to support jurisdiction under 28 U.S.C. § 1346(b)(1). The burden has thus shifted to the government to support its affirmative defense that the exception to the FTCA for intentional torts applies and is not vitiated by the investigative or law-enforcement proviso. *E.g.*, *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014); *Parrott v. United States*, 536 F.3d 629, 634–35 (7th Cir. 2008); *Stewart v. United States*, 199 F.2d 517, 519 (7th Cir. 1952). Some, though not all, of our sister circuits share our view on this allocation of the burden of proof. See *St. Tammany Par. ex rel. Davis v. FEMA*, 556 F.3d 307, 315 n.3 (5th Cir. 2009) (reviewing circuit split with focus on the burden of proving the discretionary function exception). Most of our own cases assigning this burden to the government have responded to the United States's invocation of the discretionary-function exception found in section 2680(a), *e.g.,*

*Keller*, 771 F.3d 1021, but we repeatedly have said that the same rule applies to the 13 provisions of that subsection that follow, including the intentional-tort exception, *e.g., Parrott*, 536 F.3d at 634–35.

Our reason for treating the FTCA exceptions as affirmative defenses is straightforward. Assigning the burden to the plaintiff would not simply shift the outcome in favor of the United States in a close case. It would also foist on the plaintiff the need to include allegations in her complaint designed to prove a raft of negatives—*i.e.*, that each exception does not apply—and then to prove each of these negatives as part of her case-in-chief. *Stewart*, 199 F.2d at 519. Such a system, we said, would "border on the preposterous," *id.*, forcing plaintiffs to prove countless negatives without any indication that the exceptions were even in play. The Third Circuit shares this view: "just as a plaintiff cannot be expected to disprove every affirmative defense that a defendant could potentially raise, so too should a plaintiff not be expected to disprove every exception to the FTCA." *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329 (3d Cir. 2012). The Third Circuit also noted that the government, not the plaintiff, will generally have superior access to the information that might trigger an exception. *Id.* at 333 n.2. That is certainly true for the discretionary-function and intentional-tort exceptions: the government presumably possesses its own regulations defining the mandatory duties and delegated powers of its own employees. Often these may be internal agency documents that are difficult for the public to find.

Our decision in *Keller v. United States*, 771 F.3d 1021 (7th Cir. 2014), illustrates this process well. There we held that the district court erroneously granted summary judgment for

the United States under the discretionary-function exception, 28 U.S.C. § 2680(a), when it put the burden on the plaintiff to show that the exception did not apply. *Keller*, 771 F.3d at 1026. The case involved prison violence: after his fellow prisoners had attacked and severely injured him, Keller brought an FTCA suit. *Id.* at 1022. He alleged that the guards had failed to monitor the location of the attack and that an intake psychologist had neglected to evaluate his full medical history before placing him in the general prison population. *Id.* The government asserted immunity under the discretionary-function exception, *id.* at 1024, but it failed to produce the prison regulations that would have established a grant of discretion to its employees. On that record, we said, the plaintiff was entitled to go forward:

> We cannot conclude, based on the evidence in the record, that the exception necessarily shields the government from liability … . The scant record available to both the district court and this panel makes it difficult to determine what procedures and regulations applied to the intake psychologist and prison guards … .
>
> [E]xtensive redactions [of the regulations the government provided] make it impossible for this court to ascertain exactly what regulations and procedures governed the conduct of the intake psychologist and the prison guards. The information we do have, however, suggests that both the intake psychologist and the prison guards were subject to specific regulations and orders governing their conduct. For example, … Program Statement 5324.07 requires psychology services to "develop local procedures to clear inmates with a PSY ALERT assignment," which suggests that the

[prison] had mandatory local procedures that needed to be followed when clearing inmates. [The intake psychologist's] affidavit similarly refers to procedures used to clear inmates like Keller who had a "PSY ALERT." Those procedures are not in the record, and in their absence, we cannot conclude as a matter of law that they did not constrain [the psychologist's] discretion to place Keller in the general population.

*Id.* at 1025.

Although the affidavits of prison psychologists stated that "no mandatory procedures were violated in Keller's screening," they did not "discuss[] what those procedures were or whether they constrained [the intake psychologist's] discretion." *Id.* at 1025 n.2. Because we had some hints that additional psychological screening regulations might exist, we declined to assume either that they did not apply or that they imposed no mandatory duties. Finally, we refused to accept "the declaration of a prison administrator that guards assigned to different areas of the compound [were] interchangeable and [did] not need to be in any particular area at any given time." *Id.* at 1025. What little we had of the prison regulations suggested that the contrary was true and that guards were assigned to monitor specific areas. *Id.* Without the benefit of the relevant internal prison regulations, we could not discount the latter possibility.

We have the same problem here. Faced with a record lacking a complete set of relevant ATF regulations and directives, we similarly cannot conclude that the intentional-tort exception applies to Kinard. The materials presented to the district court at the summary-judgment stage do not foreclose the possibility that the law empowered Kinard (and his fellow

chemists) to execute searches or to seize evidence. Without coming to a final decision on the point, we sketch out why we find the current record indeterminate.

The Secretary of the Treasury, or his delegate, the director of ATF, had at the relevant time statutory authority "to inspect the site of any accident, or fire, in which there is reason to believe that explosive materials were involved." 18 U.S.C. § 846 (1994); see also *id*. § 841(k); Bureau of Alcohol, Tobacco, and Firearms: Establishment, Organization, and Functions (Treasury Department Order 221), 37 Fed. Reg. 11696, 11697 (June 10, 1972). They could "enter into or upon any property where explosive materials have been used, are suspected of having been used, or have been found in an otherwise unauthorized location." 18 U.S.C. § 846; see also Bureau of Alcohol, Tobacco, and Firearms, 37 Fed. Reg. at 11697. The Secretary had authority to promulgate regulations to carry out these powers, 18 U.S.C. § 847 (1994), and he did so in 27 C.F.R. Part 55. See Recodification and Amendments to Explosive Materials Regulations, 46 Fed. Reg. 40382 (Aug. 7, 1981). The regulations authorized "[a]ny ATF officer" to "inspect the site of any accident or fire in which there is reason to believe that explosive materials were involved" or to "enter into or upon any property where explosive materials have been used, are suspected of having been used, or have been found in an otherwise unauthorized location." 27 C.F.R. § 55.31 (1995). "ATF officer" in turn was defined as "[a]n officer or employee of the Bureau of Alcohol, Tobacco and Firearms (ATF) authorized to perform any function related to the administration or enforcement of this part." *Id*. § 55.11.

Just as in *Keller* we found that the program statement's directive to "develop local procedures to clear inmates"

indicated the potential existence of mandatory screening procedures, 771 F.3d at 1025, here the reference in section 55.11 to ATF officers or employees "authorized to perform *any* function related to the administration or enforcement of this part" could support a finding that ATF officers or employees in Kinard's position have the necessary powers to qualify for the investigative or law-enforcement category. The government has not yet entered enough evidence into the record to foreclose this interpretation and to carry its burden of proof. It has not, for instance, produced delegation orders or other internal directives showing to whom, other than forensic chemists, it delegated its powers. Nor has it argued the implausible proposition that only the Secretary and ATF Director were authorized to exercise the powers granted by 18 U.S.C. § 846 and 27 C.F.R. § 55.31.

Instead, the United States has directed our attention to the Internal Revenue Code, 26 U.S.C. § 7608(a), as well as to its post-9/11 cousin, 18 U.S.C. § 3051. We do not see how those laws foreclose the possibility that Kinard held authority pursuant to 27 C.F.R. § 55.11. Section 7608 provided as follows:

> (a) Enforcement of subtitle E and other laws pertaining to liquor, tobacco, and firearms.—Any investigator, agent, or other internal revenue officer by whatever term designated, whom the Secretary charges with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of subtitle E [concerning matters including taxation of alcohol, tobacco, firearms, and destructive devices] or of any other law of the United States pertaining to the commodities subject to tax under such subtitle for the enforcement of which the Secretary is responsible, may—

(1) carry firearms;

(2) execute and serve search warrants and arrest warrants, and serve subpoenas and summonses issued under authority of the United States;

(3) in respect to the performance of such duty, make arrests without warrant for any offense against the United States committed in his presence, or for any felony cognizable under the laws of the United States if he has reasonable grounds to believe that the person to be arrested has committed, or is committing, such felony; and

(4) in respect to the performance of such duty, make seizures of property subject to forfeiture to the United States.

26 U.S.C. § 7608(a) (1994). ATF Special Agents, the government represents, were among those charged by the Secretary "with the duty of enforcing" the specified tax laws and thus were invested with the powers listed in section 7608(a). We have no reason to doubt this, nor do we have any need at this stage to quarrel with its assertion that Kinard was not an ATF Special Agent. But that is not the end of the story. Kinard's authority, to the extent it existed, could still have flowed from 27 C.F.R. § 55.11. That regulation implemented the Secretary's distinct powers conferred in 18 U.S.C. Part 40. We can put to one side the question whether Kinard might also have had some authority under section 7608(a) because Bunch has not pressed that argument, but we do not consider that point abandoned on remand, either.

Finally, we consider the contours of the power to "execute searches" under section 2680(h) and why ATF might have

vested that power in a person holding Kinard's position. The government appears to argue that only law-enforcement officers can execute search *warrants* and thus Kinard falls within the intentional-tort exception. But section 2680(h) refers to both investigative *and* law-enforcement officers, and it defines both types of officer as a person with legal authority to "execute searches, to seize evidence, *or* to make arrests." 28 U.S.C. § 2680(h). Any one of those three powers will do.

As we construe this language, we must bear in mind the Supreme Court's insistence that we not construe the waiver of sovereign immunity in the FTCA too strictly. *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 491–92 (2006); *Smith v. United States*, 507 U.S. 197, 203 (1993); *Kosak v. United States*, 465 U.S. 848, 853 n.9 (1984) (warning against overextending the exceptions in section 2680); *United States v. Yellow Cab Co.*, 340 U.S. 543, 554 (1951). We are also influenced by the broad reading of the law-enforcement proviso that the Court adopted in *Millbrook*. 569 U.S. at 55–57. In that spirit, we note that section 2680(h) does not require Kinard to have had authority to seek and execute search *warrants*; it speaks only of executing searches, and many searches do not require warrants. See, *e.g.*, *Arizona v. Grant*, 556 U.S. 332, 338–39 (2009) (search incident to arrest); *United States v. Ross*, 456 U.S. 798, 809 (1982) (automobile exception); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (consent); *United States v. Contreras*, 820 F.3d 255, 267–68 (7th Cir. 2016) (protective sweep). Furthermore, searches are normally "executed" by more than just the officer who obtained the search warrant, if there is one. An agent may take part in executing a search even if he personally does not initiate it or rifle through the space being searched and instead merely provides guidance to others about what evidence may

prove significant. *Lustig v. United States*, 338 U.S. 74, 78–79 (1949).

In *Lustig*, state officers illegally searched a hotel room after obtaining, but before executing, an arrest warrant for the hotel guest. *Id.* at 79–80. The Supreme Court took as a given that a Secret Service agent had not requested the search, initiated the search, or physically emptied containers; that the agent was not present when the search began; and that local police had not undertaken the search to enforce federal laws. *Id.* at 77–78. Nonetheless, the Court concluded that the agent had "searched" the apartment because he helped to identify significant evidence for investigation and potential seizure:

> [S]earch is a functional, not merely a physical, process. Search is not completed until effective appropriation, as part of an uninterrupted transaction, is made of illicitly obtained objects for subsequent proof of an offense. [Secret Service Agent] Greene's selection of the evidence deemed important for use in a federal prosecution for counterfeiting … was part of the search carried on in that room. … [B]efore the search was concluded Greene was called in, and although he himself did not help to empty the physical containers of the seized articles he did share in the critical examination of the uncovered articles as the physical search proceeded. … Had Greene accompanied the city police to the hotel, his participation could not be open to question even though the door of [the hotel room] had not been opened by him. To differentiate between participation from the beginning of an illegal search and joining it before it had run its course, would be to draw too fine a line … .

> [A] search is a search by a federal official if he had a hand in it … . So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it.

*Id.* at 78–79.

Bunch put forward evidence that Kinard's job, like Greene's, included the identification of relevant evidence for colleagues during crime-scene investigations. Undoubtedly there are many employees of ATF for whom the same cannot be said. But forensic chemists, according to the summary-judgment record before us, do play at least this active a role. Perhaps this account can be controverted at trial. For now, however, Bunch did enough to defeat summary judgment in favor of the United States, given that the burden of proof rested with the government.

### III

We conclude that there are too many disputed issues about the scope of the duties that an ATF forensic chemist such as Kinard (let alone a gunshot-residue specialist-analyst) performs. It was therefore error for the district court to grant summary judgment in the government's favor. We REVERSE and REMAND for further proceedings consistent with this opinion.