# In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 03-1071 & 03-1080

KRISTY SPURGIN-DIENST, Executor of the Estate of
Terry A. Spurgin, Deceased, and LINDA J. BAUER,
as Executor of the Estate of John H. Bauer, Deceased,
and as Executor of the Estate of William H. Bauer III,
Deceased,

*Plaintiffs-Appellants*,

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

———————

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
Nos. 00-CV-8075 & 01-CV-385—**Harry D. Leinenweber**, *Judge.*

———————

ARGUED DECEMBER 4, 2003—DECIDED FEBRUARY 20, 2004

———————

Before BAUER, EASTERBROOK, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* With mechanical error ruled out,
the issue in this case, tried to the court under the Federal
Tort Claims Act (FTCA), was whether pilot error or ground
error caused a single-engine Beechcraft Bonanza airplane
to crash in an Indiana field killing all four persons aboard.
The estates of the three deceased passengers brought the
case alleging ground error: negligence by the United States
through the Federal Aviation Administration (FAA) and

personnel at Air Traffic Control (ATC) and the Flight Service Station (FSS). The government defended the suit claiming the proximate cause of the crash was the negligence of the pilot.

As is the norm in many tort cases, the trial here became a battle of expert witnesses, with those called by one side pointing the finger of blame at the other side. The district judge, Harry D. Leinenweber, ultimately found for the government, and the estates appeal, arguing essentially that the defense witnesses were incredible, that the federal employees the pilot communicated with were negligent, and that the pilot was blameless.

The pilot on the ill-fated March 20, 1998, flight was Daniel Sanders. The passengers were John Bauer (40), his son William (20), and Terry Spurgin (42). The departure point was Louisville, Kentucky, with Aurora, Illinois, as the destination. While en route, the plane encountered icing conditions, forcing Sanders to attempt an emergency landing at a small airport near New Lebanon, Indiana. It didn't make it.

Judge Leinenweber concluded that Sanders' decision to fly the plane into known icy conditions was the proximate cause of the crash. In reaching his conclusion, the judge rejected the claim that Sanders was not given pertinent weather information and that he was misdirected as he attempted to land the plane. The estates also argue that the judge misapplied Indiana law and that he should have ordered a new trial based on discovery violations.

When reviewing a bench trial, legal decisions are reviewed *de novo*, *Johnson v. West*, 218 F.3d 725, 729 (7th Cir. 2000), and findings of fact are reviewed under a deferential clearly erroneous standard. *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985). Under this standard, one who contends that a finding is clearly erroneous has an exceptionally heavy burden to carry on appeal. This is especially true

when, as here, the estates argue that the district court erred in crediting the testimony of experts called by the defense. This is so because, as we have frequently stated, the "trial judge is in the best position to judge the credibility of witnesses who offer conflicting testimony . . . ." *United States v. Woods*, 233 F.3d 482, 484 (7th Cir. 2000). Such a credibility determination "can virtually never be clear error." *United States v. Archambault*, 62 F.3d 995, 999 (7th Cir. 1995). With these principles in mind, we turn to the evidence presented at trial.

Prior to departing, Sanders told the Louisville FSS that he would be flying to Aurora. In response to Sanders' concern about possible icing conditions, a weather briefer, Charles Gilpin, provided a weather advisory, called an Airman's Meteorological Information (AIRMET), that warned of occasional "moderate rime or mixed icing along the entire route of flight" to Aurora.[1] In addition, Gilpin told Sanders that a surface observation made in the Terre Haute, Indiana, area (which was along Sanders' flight path about halfway between Louisville and Aurora) indicated light snow and mist and a surface temperature of 2 degrees Celsius. For the Aurora airport, surface observations also indicated a surface temperature of 2 degrees Celsius, along with winds at 18, gusting to 26, knots. Sanders also received pilot reports, called PIREPs. These are pilot observations of actual weather conditions recently encountered. Sanders was told of one PIREP received from Louisville which reported "light to moderate rime icing."

---

[1] According to the evidence, there are two types of icing: rime icing and clear icing. Rime icing is caused by freezing of micro droplets. When the droplets freeze, some air is trapped, and the result is something similar to frost that can attach to the airplane. When water droplets are bigger than micro droplets, the drops hit the plane, lose their shape, run backwards, and form clear ice. Either kind of icing destabilizes a plane.

A second PIREP, also from the Louisville area, reported "moderate to severe mixed icing." A third PIREP from Lafayette, Indiana, reported "light rime" icing. After receiving this weather briefing, Gilpin asked Sanders if he needed more information. Sanders declined. The weather briefing ended at 6:22 p.m.

Thirty minutes later, Sanders filed a flight plan from Louisville to Aurora stating that he would be flying at 4,000 feet. The weather briefer asked if he needed another briefing, but Sanders said it wasn't necessary because he received one earlier.

At 7:15 p.m., the plane left Louisville. About 25 minutes later, the aircraft entered the jurisdiction of the Evansville approach controller, some 50 miles from Louisville. Sanders asked for icing reports for the area. The controller, Kyle Koop, responded that there were none for the last 2 hours. This was not true. In fact, there were two PIREPs which confirmed icing conditions. One was received 55 minutes earlier from a pilot about 30 miles to the south. The pilot reported that he encountered icing conditions at 8,000 feet, continued to pick up ice until below 4,500 feet, and the ice melted at 2,500 feet. The second pilot, reporting about 40 minutes before Sanders checked in, reported icing at 7,000 feet. Koop stated that he didn't give these reports to Sanders because they were not pertinent to his flight path. About this time, Sanders' aircraft began accumulating ice.

Less than 4 minutes later, at 7:45, the aircraft entered the jurisdiction of the Terre Haute approach controller, and Sanders requested icing reports for the area. The controller, Jennifer Stahley, told Sanders that there hadn't been any for several hours, but she did convey several earlier reports of icing.

Sanders then requested and was given clearance to descend to 3,000 feet. At 7:52, after reaching 3,000 feet, he

reported that the plane had accumulated ice and asked for permission to land at Terre Haute, which he received. Nine minutes later, however, Sanders reported that he was losing airspeed and requested a closer airport. Stahley directed Sanders to the Sullivan County Airport, which was about 5 miles ahead of him. Stahley advised Sanders that he had a choice of two approaches, a VOR-Alpha approach or an NDB (Non-Directional Beacon) approach. The VOR is a circling approach that requires making several turns. The NDB approach, in contrast, is almost straight in. Stahley did not tell Sanders of Robinson airport, which was 11 miles due west of Sanders' flight line.

Sanders chose the VOR-Alpha approach, and Stahley attempted to lead Sanders to the airport, directing him to make what she thought were the necessary turns. About 8:05, she said Sanders was 2-1/2 miles from the final approach point, and she gave him a vector to the northeast to intercept the final approach course.

The final radio contact with Sanders occurred one minute later when he said, "Heck, we're all over the place right now." At about this time, all radar and radio contact was lost. One minute later, the plane crashed about 5 miles from Sullivan airport.

With these facts in mind, we turn to the merits of the appeal. As an initial matter, the district court identified the correct inquiry under Indiana tort law.[2] As the court stated,

---

[2] The Federal Tort Claims Act provides a remedy for personal injury caused by the negligent or wrongful act of any government employee acting within the scope of his employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place" where the act occurred. 28 U.S.C. § 1346(b)(1); *see also Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1297 (7th Cir.

(continued...)

"[T]o prevail on the facts the plaintiffs must show by the preponderance of the evidence that some act or omission on the part of the flight service briefer, or a traffic controller was a proximate cause of the icing and/or the inability of Sanders to land the plane safely." This is correct. The Indiana Supreme Court recently noted that "a negligent defendant may be liable for a plaintiff's injury if his or her action is deemed to be a proximate cause of that injury." *Control Techniques, Inc. v. Johnson*, 762 N.E.2d 104, 108 (Ind. 2002).

Applying this standard, the district court's factual determinations are not clearly erroneous. The Air Traffic Control Service had no duty to restrain Sanders from taking off in hazardous weather, *see Davis v. United States*, 824 F.2d 549, 551 (7th Cir. 1987), and the court's conclusion that Sanders' decision to fly into known icing conditions was the proximate cause of the crash and that nothing government agents on the ground did or did not do made a difference is amply supported by the record.

To begin, contrary to the estates' argument that Sanders flew into only "forecasted" or "suspected" icing conditions, the evidence supports the conclusion that Sanders left Louisville in the face of weather reports and forecasts that put him on notice that he would be flying through "known"

---

(...continued)
1991). Because the alleged negligent act or omission occurred in Indiana, we apply Indiana choice-of-law rules. Those rules require application of Indiana law. *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1016 (7th Cir. 2002) ("Indiana is a *lex loci delicti* state: in all but exceptional cases it applies the law of the place where harm occurred.").

icing conditions for his entire route.[3] The weather briefing Sanders received warned of "occasional moderate rime or mixed icing along the entire route of flight . . . ." More significantly, he also was told of surface observations and actual pilot reports of icing. It is these icing conditions that he encountered that caused an ice buildup on the plane and that, in turn, caused the crash.

Of course, FAA personnel committed errors. For example, Gilpin failed to provide the Area Forecast (FA) and the Meteorological Impact Statement (MIS) to Sanders which contained information about icing conditions. Furthermore, Koop incorrectly told Sanders that he had not had any PIREPs of icing in 2 hours. The district court's conclusion that having this information would not have led Sanders to change course, however, is not clearly erroneous. With respect to the FA and MIS, Sanders already knew he was flying into icing conditions. Considering he departed Louisville despite knowing that other pilots had encountered icing conditions, there is no reason to conclude these additional forecasts would have made a difference. As for the pilot reports Koop failed to give, one, received about 55 minutes before Sanders' request, stated that the pilot had encountered icing conditions at 8,000 feet, which stopped accumulating when he fell to 4,500 feet and melted at 2,500 feet. That pilot was 30 miles south of Sanders' location, however, and all it would have told Sanders is that in the warmer air to the south he could lose ice if he descended to 2,500 feet. The other pilot reported icing conditions at 7,000 feet, which was 3,000 feet above Sanders' altitude. Like the

---

[3]  Under federal law, "no person may operate a civil aircraft without complying with the operating limitations specified in the approved Airplane . . . flight manual . . . or placard." 14 C.F.R. § 91.9. The flight manual in Sanders' plane stated, "FLIGHT IN KNOWN ICING CONDITIONS IS PROHIBITED."

FA and MIS reports, it is speculation whether either of these reports would have led Sanders to change his flight plan.

Furthermore, the evidence suggests that Stahley gave Sanders improper information when directing him to land at Sullivan airport. Stahley told Sanders that he was "about two and a half miles" from the final approach point and to turn right to intercept the final approach course. The estates' experts stated, however, that the actual distance was 3-1/2 or 4-1/2 miles. The National Track Analysis Program (NTAP) radar data suggests the distance was closer to 5 miles.

It was reasonable for the district court to hold that Sanders, due to icing on the plane, could not have made the VOR approach to Sullivan airport. The evidence at trial showed that the plane was doomed once the pilot turned away from Sullivan for the VOR approach. The accumulating ice caused the aircraft to lose thrust and lift. The plane simply did not have enough speed and altitude to make the airport. Thus, nothing Stahley did in vectoring him contributed to the accident. Nor, as the estates argue, would knowing about Robinson airport have made a difference. First, Sullivan was closer and was on his flight plan. Moreover, since the plane was not able to reach Sullivan airport safely, nothing suggests it could have landed at Robinson. Considering these facts, the estates fail to meet their heavy burden of establishing that the district court's factual findings were clearly erroneous.

The estates' reliance on *Pierce v. United States*, 679 F.2d 617 (6th Cir. 1982) (*Pierce I*), is misplaced. In an FTCA suit arising from an airplane crash in which the pilot was not warned of weather problems, the district court had granted judgment to the United States on the grounds that the plaintiffs were unable to prove whether the plane crashed due to weather or pilot error. The Sixth Circuit

reversed and remanded, holding that even if the plaintiffs could not distinguish between pilot error and weather as the proximate cause of the crash, the possibility remained that the United States could have contributed to the accident by failing to give weather information. *Id.* at 619-21. On remand, the district court held that the United States was negligent in failing to provide the necessary weather information but that the proximate cause of the crash was pilot error resulting from vertigo when the pilot unnecessarily flew into a cloud. On appeal after remand, the Sixth Circuit affirmed. *Pierce v. United States*, 718 F.2d 825, 828 (6th Cir. 1983) (*Pierce II*).

Unlike *Pierce I*, the district court here carefully considered whether the government's negligence contributed to the crash. Consistent with *Pierce II*, however, the district court held that the proximate cause of the crash was pilot error.

The estates' other arguments are equally unavailing. First, the district court did not err in failing to apply Indiana's Comparative Fault Act, Ind. Code. Ann. § 34-51-2-7 *et seq.* Here, there was no finding of proximate cause attributed to the United States. Therefore, there was no need to apportion liability.

Second, the district court did not commit error by denying the estates' Rule 60(b) motion for a new trial due to alleged discovery violations. The estates argue that they were not given evidence, an Event Reconstruction Recording (EVR) that records the data Gilpin used in formulating the weather briefing for Sanders, until the middle of trial. However, the United States did not use the EVR in its case-in-chief, and the estates' counsel had ample time to review it and decide whether to use it, an agreement the estates' counsel admitted was "a good solution." By accepting this arrangement, the estates waived their objection to any possible discovery violation. Nor do we believe, considering

the limited import of the EVR (evident by the fact that neither party used it at trial), that the court abused its discretion in denying the Rule 60(b) motion.

Finally, we have considered the estates' remaining arguments and deem them to be without sufficient merit. This was, of course, a sad and tragic case. But we think Judge Leinenweber carefully heard and analyzed the evidence, and we do not believe his findings of fact are clearly erroneous. Nor did he misapply controlling Indiana law.

The judgment of the district court is AFFIRMED.

A true Copy:

      Teste:

                      _____

                      *Clerk of the United States Court of Appeals for the Seventh Circuit*