# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2205

PEGGY S. LEGRANDE,

*Plaintiff-Appellant*,

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:08-cv-02047—**Joan B. Gottschall**, *Judge*.

ARGUED OCTOBER 26, 2011—DECIDED JULY 18, 2012

Before RIPPLE and HAMILTON, *Circuit Judges*, and
MYERSCOUGH, *District Judge*.[*]

RIPPLE, *Circuit Judge*.    While working as a flight
attendant on Southwest Airlines Flight 2745, Peggy S.
LeGrande was injured when the aircraft encountered
severe turbulence. She brought this action against the

[*] The Honorable Sue E. Myerscough of the Central District
of Illinois, sitting by designation.

United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674, alleging that air traffic controllers employed by the Federal Aviation Administration ("FAA") negligently had failed to warn the flight's captain that turbulence had been forecast along the flight path.[1] The district court concluded that FAA employees did not breach any duty owed to Ms. LeGrande and granted summary judgment for the United States. Ms. LeGrande now seeks reversal of the district court's judgment.[2] She also contends, for the first time in this litigation, that her injuries resulted from the negligence of a National Weather Service ("NWS") meteorologist. Because the FAA breached no duty owed to Ms. LeGrande, and because Ms. LeGrande failed to give the NWS the notice that the FTCA requires, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

Before discussing the events that culminated in Ms. LeGrande's injuries, we set forth, in summary form, the role that the FAA and the NWS play in the operation of our Nation's air traffic control system.

---

[1] The district court has jurisdiction under 28 U.S.C. §§ 1331 and 1346(b).

[2] We have jurisdiction under 28 U.S.C. § 1291.

**1.**

The FAA operates a nationwide network of ground-based air traffic control centers that are responsible for aircraft flying in the national airspace system. As Justice Jackson wrote in his concurring opinion in *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292 (1944):

> Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls.

*Id.* at 303 (Jackson, J., concurring); *see also City of Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 633 (1973).

The FAA operates more than three hundred facilities for the control of aircraft. These facilities are located throughout the United States and have different capabilities, depending on their role in the Nation's air transport system. Central to the case before us is the Air Route Traffic Control Center ("ARTCC"). Its basic mission is to provide air traffic control service to aircraft operating within controlled airspace, principally during the en route phase of flight. *See* Michael S. Nolan, *Fundamentals of Air Traffic Control* (5th ed. 2011). The ARTCC responsible for providing guidance to Flight 2745 at all times pertinent to our discussion is located in Cleveland, Ohio (the "Cleveland Center"), and is responsible for air traffic control in high-altitude airspace over

portions of six states—Maryland, Michigan, New York, Ohio, Pennsylvania and West Virginia—as well as southern Ontario.

ARTCC facilities are staffed by air traffic controllers employed by the FAA. Operating under FAA directives, the primary duties of air traffic controllers are to prevent collisions between aircraft flying in the air space sectors assigned to them, organizing and expediting the flow of air traffic, and supporting national security and homeland security operations. To the extent consistent with these primary responsibilities, air traffic controllers also provide lower-priority services to operating aircraft, including broadcasting certain specific weather-related information to pilots.

**2.**

FAA personnel receive various weather reports, called "weather products." These are provided by the three Meteorological Watch Offices[3] and by NWS meteorologists stationed at the Center Weather Service Units embedded in each ARTCC, including the Cleveland Center. This case involves several weather products; we shall describe them briefly.

---

[3] The Meteorological Watch Offices include the Aviation Weather Center in Kansas City, Missouri, the Alaska Aviation Weather Unit and the Weather Forecast Office in Honolulu, Hawaii.

### a. Meteorological Impact Statement

A Meteorological Impact Statement ("MIS") is "an unscheduled flow control and flight operations planning forecast" that a meteorologist provides to assist FAA personnel in "making flow control-type decisions." NWS Instruction 10-803 § 7.5 (Jan. 5, 2005). NWS regulations state that, at a minimum, an MIS should be issued when:

> a. Any of the following conditions occur, are forecast to occur, and, if previously forecast, are no longer expected:
>
> > (1) Conditions meeting convective SIGMET criteria (see NWSI 10-811)
> >
> > (2) Icing—moderate or greater
> >
> > (3) Turbulence—moderate or greater
> >
> > (4) Heavy precipitation
> >
> > (5) Freezing precipitation
> >
> > (6) Conditions at or approaching Low IFR (see NWSI 10-813)
> >
> > (7) Surface winds/gusts [greater than or equal to] 30 knots
> >
> > (8) Low Level Wind Shear (surface—2,000 feet)
> >
> > (9) Volcanic ash, dust storms, or sandstorms; <u>and</u>
>
> b. In the forecaster's judgment, the conditions listed above, or any others, will adversely impact the flow of air traffic within the ARTCC area of responsibility.

*Id.* (emphasis in original). An MIS is designed as a broad prediction; it is valid for up to twelve hours and can cover a wide geographic area. These weather products are designed to provide those responsible for the *flow* of aircraft traffic with an estimation of weather conditions that may interfere with air traffic patterns in the hours ahead. Although this weather product is publicly available on the NWS Aviation Weather Center website, air traffic controllers do not broadcast an MIS to pilots. Pilots in command of aircraft aloft need real time weather information to handle current situations on the aircraft's route of travel. This report simply does not supply that information.

### b. Center Weather Advisory

A Center Weather Advisory ("CWA") is a warning that weather conditions in a relatively limited geographic area are expected to approach or meet national in-flight advisory criteria. NWS Instruction 10-803 § 7.6 (Jan. 5, 2005). In contrast to an MIS, a CWA is "primarily used by air crews to anticipate and avoid adverse weather conditions." *Id.* NWS regulations state:

> There are four (4) situations in which a CWA should be issued:
>
> 1. When existing or anticipated weather conditions do not meet national in-flight advisory criteria (i.e., in terms of intensity or areal coverage) but current [pilot reports] or other weather information sources indicate those conditions, in the judgment of the [Center Weather Service Unit]

meteorologist, will adversely impact the safe flow of air traffic within the ARTCC area of responsibility.

2. As a supplement to an existing in-flight advisory. The issuance of a CWA in this circumstance should be limited to occasions when, in the judgment of the [Center Weather Service Unit] meteorologist, a redefining statement or update, in advance of a new national advisory, is adequately supported by real-time information. . . .

3. When an in-flight advisory has not been issued, but observed or expected weather conditions meet in-flight advisory criteria (based on current [pilot reports] and/or other sources of information). . . .

4. To cancel a CWA when the phenomenon described in the CWA is no longer expected. . . .

*Id.*

When a meteorologist issues a CWA, the information is printed on a General Information Strip at the responsible air traffic controllers' stations. Each air traffic controller reads the strip aloud, broadcasting it once to all pilots on that radio frequency. If the information includes certain weather conditions, the controller advises pilots to tune into the Hazardous Inflight Weather Advisory Service ("HIWAS"), Flight Watch or Flight Service, depending on the geographic area.[4]

---

[4] The HIWAS broadcasts "[c]ontinuous recorded hazardous

(continued...)

### c. Pilot Report

A Pilot Report ("PIREP"), as the name suggests, is a report of adverse weather conditions that an air traffic controller receives directly from a pilot rather than from an NWS Meteorological Watch Office or an NWS meteorologist at a Center Weather Service Unit. The relevant FAA directive instructs air traffic controllers to "[s]olicit PIREPs when requested or when one of [an enumerated list of] conditions exists or is forecast for [their] area of jurisdiction." FAA Job Order 7110.65P § 2-6-3(a). Weather conditions under which an air traffic controller should solicit PIREPs include "[t]urbulence of moderate degree or greater." *Id.* § 2-6-3(a)(4). Upon receiving a PIREP, an air traffic controller broadcasts it to relevant flights and enters it into the air traffic control computer system. PIREPs are publicly available on the FAA website.

PIREPs are common; the record reflects that the Cleveland Center receives hundreds to thousands of PIREPs every day. They also are limited temporally in their usefulness; FAA regulations do not identify a specific duration for each PIREP, but the parties agree that PIREPs "provide useful weather data for 30 to 60 minutes, unless pilots continue to report the same weather condition in the same location." R.70 at 11.

---

[4] (...continued)
inflight weather forecasts . . . to airborne pilots." FAA Pilot/Controller Glossary. The HIWAS is not available in all areas; Flight Watch and Flight Service provide en route weather updates and pilot weather reports in non-HIWAS areas.

**B.**

With this background, we turn to the events of February 10, 2006, that are the factual predicate of this action. On that day, Ms. LeGrande was working as a flight attendant on a Southwest Airlines aircraft. Throughout the day, the aircraft had been flying various routes in the Midwest. Its penultimate trip was from Chicago to Cleveland. Its final trip of the day was the return trip from Cleveland to Chicago. For this final leg of its daily schedule, the aircraft was operating as Southwest Airlines Flight 2745.

During the course of that day, Thomas Janus, an NWS meteorologist on duty at the Cleveland Center Weather Service Unit, issued three weather products relevant to this litigation: MIS 02, MIS 03 and a CWA. Both MIS 02 and MIS 03 warned the FAA's Traffic Management Unit that, over the twelve-hour period following the issuance of each MIS, frequent moderate turbulence to isolated severe turbulence could develop over portions of Michigan, New York, Ohio and Pennsylvania—a large part of the airspace within the Cleveland Center's area of responsibility. Janus issued the first of these weather products, MIS 02, at 2:42 p.m. He limited it to altitudes of 17,000 to 27,000 feet. The second weather product, MIS 03, was issued at 9:06 p.m. and related to the same geographic area but to altitudes of 17,000 to 32,000 feet. Janus also issued a CWA at 8:31 p.m., in response to a PIREP of severe turbulence at 32,000 feet in airspace *east* of Cleveland. The parties do not dispute that Janus believed the weather system was moving east from Cleveland.

Prior to departure on the final leg of the aircraft's daily schedule, a Southwest Airlines dispatcher provided the captain of Flight 2745 with a pre-flight information packet. The packet contained weather-related information, including a private meteorologist's forecast of moderate turbulence at 20,000 to 26,000 feet and a number of PIREPs, one of which was a report of severe turbulence at 20,000 to 22,000 feet over Windsor, Ontario.[5] Based on this information, the Southwest Airlines dispatcher advised the captain of Flight 2745 to fly at 30,000 feet. However, the captain elected to fly at 20,000 feet because he had encountered turbulence above 24,000 feet on the previous flight from Chicago to Cleveland. The captain requested and received permission from the controller at the Cleveland Center to fly at 20,000 feet; he did not inform his Southwest Airlines dispatcher of his decision. Neither the dispatcher nor the air traffic controller informed Flight 2745 of MIS 02, MIS 03 or the CWA that Janus had issued earlier.

Flight 2745 took off from Cleveland Hopkins International Airport at 9:40 p.m. Shortly thereafter, the aircraft encountered a light to moderate bump, and the pilots instructed the flight attendants to take their seats. Within

_____

[5] Several PIREPs were not included in the Southwest Airlines weather package because the dispatcher did not consider them pertinent to Flight 2745. These included a 6:45 p.m. report of severe turbulence at 19,000 to 21,500 feet over the Boiler VHF Omnidirectional Radio Range and an 8:10 p.m. report of moderate to severe turbulence at 20,000 to 21,000 feet over Portland, Indiana.

five seconds of the pilots' order, Flight 2745 encountered severe turbulence for approximately fifteen seconds. Ms. LeGrande, who presumably had not had time to secure herself in a seat, was injured and rendered unconscious during the episode. Flight 2745 provided the air traffic controller with a PIREP describing severe turbulence at 9:58 p.m. Several physicians aboard Flight 2745 cared for Ms. LeGrande until the aircraft landed at Chicago Midway International Airport.

## C.

On September 20, 2007, Ms. LeGrande filed an administrative "Claim for Damage, Injury, or Death" with the FAA. She sought $25 million for her turbulence-related injuries. In her claim, Ms. LeGrande alleged that "[t]he United States of America, through the Federal Aviation Administration, its employees, agents and representatives, were negligent in that they breached their duties under the rules and regulations governing the performance of their job duties." R.45-2 at 4. The FAA denied the claim.

Ms. LeGrande then filed this FTCA action against the United States. She alleged that FAA personnel had failed to advise the captain of Flight 2745 of two PIREPs of severe turbulence in the area. After it was determined that one of the two PIREPs in her complaint was the 9:58 p.m. broadcast from Flight 2745 itself, Ms. LeGrande filed an amended complaint. In that pleading, Ms. LeGrande alleged, in relevant part, that

> the [FAA] and the air traffic supervisors, controllers and other FAA personnel handling SWA Flight

2745 within the airspace boundaries of the Cleveland Air Traffic Control Center were aware of pilot reports, weather reports and forecasts and other weather[-]related products generated and issued by the Cleveland Center Weather Service Unit meteorologist respecting severe clear air turbulence reported and/or forecasted to exist in and/or within close proximity to the flight path and chosen altitude of flight SWA 2745, including its flight path through the airspace boundaries of the Cleveland Air Traffic Control Center's jurisdiction.

. . .

[T]he United States of America, individually and/or through the FAA, its employees, agents and representatives, breached the duty owed to the Plaintiff by failing to provide the pilot of SWA Flight 2745 with the aforementioned known, existing, pertinent pilot reports, weather reports, advisories and impact statements and forecasts issued by the meteorologist in the Center Weather Service Unit at Cleveland Center respecting severe clear air turbulence existing in and near the flight path and chosen altitude of SWA Flight 2745.

R.45 at 2-3.

Following discovery, Ms. LeGrande and the Government filed cross-motions for summary judgment. Ms. LeGrande provided more detail about her claims in her summary judgment filings. She asserted that the three weather products issued by NWS meteorologist

Janus—MIS 02, MIS 03 and the CWA[6]—had alerted FAA personnel at the Cleveland Center of severe turbulence in the airspace through which they knew Flight 2745 would be flying. The Government contested the existence of a duty, the allegation that FAA personnel breached any duty and causation.

The district court concluded that the United States, through the FAA, owes a duty of reasonable care to an aircraft, passengers, crews and cargoes in the performance of air traffic control responsibilities and that this duty includes warning pilots of certain weather conditions. Nevertheless, the district court determined that the FAA had not breached that duty here. Specifically, the district court concluded that the duty owed by air traffic controllers does not include an obligation to disseminate MIS notifications to pilots because such weather products are designed for traffic planning purposes rather than for providing immediate navigational guidance to aircraft already aloft. The court further determined that the CWA issued before the departure of Flight 2745 was not pertinent because it was limited to airspace east of Cleveland through which Flight 2745, heading west from Cleveland to Chicago, did not travel. The district court similarly concluded that the pilot reports on which Ms. LeGrande relied were not pertinent

---

[6] Although she mentioned PIREPs in her Amended Complaint and her Memorandum in Support of Summary Judgment, Ms. LeGrande later conceded that there were no PIREPs pertinent to Flight 2745. R.70 at 6.

to Flight 2745. Given these circumstances, the district court concluded, FAA personnel had not breached any duty owed to Ms. LeGrande by failing to broadcast turbulence warnings to Flight 2745.

## II

## DISCUSSION

We review a district court's grant of summary judgment de novo. *See Massey v. United States*, 312 F.3d 272, 276 (7th Cir. 2002). Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the district court is faced with cross-motions for summary judgment, as in this case, "we construe all inferences in favor of the party against whom the motion under consideration is made." *Edwards v. Briggs & Stratton Ret. Plan*, 639 F.3d 355, 359 (7th Cir. 2011) (internal quotation marks omitted).

To survive summary judgment, Ms. LeGrande must provide facts that, when taken in the light most favorable to her, establish a genuine issue of material fact as to whether her injuries resulted from the Government's breach of a duty owed to her. She seeks to do so in two ways: by maintaining that FAA personnel negligently failed to broadcast turbulence predictions to Flight 2745 and by introducing the argument, not raised before the district court, that NWS meteorologist Janus was negligent for not providing his turbulence predictions to FAA personnel. We address each contention in turn.

## A. The Duty of Air Traffic Controllers

### 1.

The FTCA serves as a limited waiver of the sovereign immunity of the United States. It therefore opens the federal government to tort liability "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

We agree with the parties that Ohio law governs this case. *See Richards v. United States*, 369 U.S. 1, 9-10 (1962). Because the alleged negligent act or omission occurred in Ohio, we apply Ohio choice-of-law rules. *See Spurgin-Dienst v. United States*, 359 F.3d 451, 455 n.2 (7th Cir. 2004). Ohio has adopted the Restatement (Second) of the Law of Conflicts § 146, under which "a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit." *Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286, 289 (Ohio 1984). At the time Ms. LeGrande was injured, Flight 2745 was flying in Ohio airspace and was under the jurisdiction of air traffic controllers based in Cleveland, Ohio. The parties have not suggested that any other state has a more significant relationship to the lawsuit than does Ohio. Therefore, we apply Ohio tort law.

Under Ohio law, it is well settled that the elements of an ordinary negligence suit between private parties are (1) the existence of a legal duty, (2) the defendant's breach of that duty and (3) an injury that is proximately caused by the defendant's breach. *Wallace v.*

*Ohio Dep't of Commerce*, 773 N.E.2d 1018, 1025-26
(Ohio 2002).

**2.**

The parties agree that the FAA air traffic controllers at
the Cleveland Center had a duty to provide air traffic
control guidance to Flight 2745. What they dispute is the
*scope* of that duty.[7] In Ms. LeGrande's view, FAA personnel
knew that severe turbulence had been predicted on Flight
2745's flight path, and the agency therefore breached
its duty to her when the air traffic controllers failed to
warn the captain of the forecaster's predictions.

As we noted earlier, in analyzing negligence claims
under the FTCA, the courts of appeals are in agree-
ment that state substantive law governs whether the

---

[7] To the extent that Ms. LeGrande may be attempting to
challenge the FAA's determination as to which weather
products are useful to pilots, we believe that this deter-
mination is a discretionary function that falls within the dis-
cretionary function doctrine, which limits the FTCA's waiver
of sovereign immunity. *See United States v. Gaubert*, 499 U.S. 315,
322-25 (1991) (discussing discretionary function doctrine);
*Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988)
(same); *United States v. Varig Airlines*, 467 U.S. 797, 814-15 (1984)
(applying the discretionary function doctrine to an FAA
certification process); *Collins v. United States*, 564 F.3d 833, 838-
39 (7th Cir. 2009) (applying the discretionary function
doctrine to the FAA's decision not to install radar at a regional
airport).

defendant owed a duty of care to the plaintiff.[8] In the aviation context, however, the courts often have given content to the elements of state law by referring to federal standards. The reasons for this reference to federal law are twofold. First, exclusive federal jurisdiction over such claims, as a practical matter, has prevented state courts from developing controlling legal principles at a sufficient level of specificity.[9] More fundamentally, when the federal employee's actions are dictated by federal law and regulations, reference to those sources is necessary to understand the nature of the employee's duties and the limitations on his authority. Accordingly, it is not surprising that FTCA cases concerning air traffic controllers have imported standards from the regulations or the air traffic manuals in determining the contours of the state-law duty.[10] Notably, Ohio law

---

[8] *See, e.g.*, *Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 743 (8th Cir. 2009) (holding that Minnesota law governs plaintiff's negligence action brought under the FTCA); *St. Tammany Parish ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 317 (5th Cir. 2009) (stating that, "[a]s long as state tort law creates the relevant duty, the FTCA permits suit for violations of federal statutes and regulations"); *Ochran v. United States*, 273 F.3d 1315, 1317 (11th Cir. 2001) (noting that, in a negligence action, the court would "turn to the law of Florida to determine whether [the defendant] owed a duty of care").

[9] *Glorvigen*, 581 F.3d at 743.

[10] *See id.* at 743-44; *see also Tinkler v. United States ex rel. F.A.A.*, 982 F.2d 1456, 1461 (10th Cir. 1992) ("Mead's duty arose from

(continued...)

[10] (...continued)

both the dictates of the *Flight Services Manual* as well as the reliance pilots place on FSS briefers."); *Moorhead v. Mitsubishi Aircraft Int'l, Inc.*, 828 F.2d 278, 282 & nn. 13-14 (5th Cir. 1977) (relying on the manual to establish a duty of care); *Gill v. United States*, 429 F.2d 1072, 1075 (5th Cir. 1970) (same); *cf. Johnson v. Sawyer*, 47 F.3d 716, 728-29 (5th Cir. 1995) (en banc) (holding that violation of a duty created by federal law would not support an FTCA claim, but noting that the same violation may constitute a violation of a state-imposed duty on a "negligence per se concept"); *Jackson v. United States*, 156 F.3d 230, 234 (1st Cir. 1998) (rejecting, as a matter of West Virginia law, plaintiff's negligence per se theory built on controller's failure to follow manual, but suggesting that it could be "some evidence of negligence"). It should be noted that some of these cases have imported the standards with a more precise legal analysis than others by specifically ex-plaining the difference between importing a *federal duty* and importing a *federal standard of care* to define a *state-law duty*. *But cf. Holbrook v. United States*, 673 F.3d 345, 347 (4th Cir. 2012) ("If select passages from a lengthy and complex order could serve as the basis for government tort liability, the FAA would be hobbled by the specter of litigation as it worked to promote aircraft safety. The price of circulating internal guid-ance should not be an exponential increase in exposure to a tort suit.").

It is worth noting that this approach to defining state-law duties by reference to federal sources is not unique to the aviation context. *See Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008) (noting that, under Supreme Court cases, federal statutes provided a duty of care owed to federal inmates, but

(continued...)

appears to recognize the necessity of referring to federal legal principles in such a situation. *See Salisbury v. Gordon Air Mgmt. Corp.*, No. 19085, 2000 WL 92087, at *5 (Ohio Ct. App. Jan. 19, 2000);[11] *see also Freeman v. United States*, 509

---

[10] (...continued)

also that, "[t]o the extent that the FTCA requires us to assess the Government's duty under Indiana law, . . . there is no hint that Indiana law would differ on this point"); *see also Bolt v. United States*, 509 F.3d 1028, 1031-32 (9th Cir. 2007) (reiterating that a federal rule, such as the Army rules for snow removal, can determine standard of care in exercising state law duty); *Medina v. United States*, 259 F.3d 220, 223 (4th Cir. 2001) (in case involving immigration detention of foreign diplomat, noting that the FTCA "serves to convey jurisdiction when the alleged breach of duty is tortious under state law, *or when the Government has breached a duty under federal law that is analogous to a duty of care recognized by state law*" (emphasis added) (internal quotation marks omitted)).

[11] In *Salisbury v. Gordon Air Mgmt. Corp.*, No. 19085, 2000 WL 92087 (Ohio Ct. App. Jan. 19, 2000), a pilot was sued following a crash for failure to abide by an FAA regulation concerning when an aircraft may fly into "known or forecast moderate icing conditions." *Id.* at *4. Relying in part upon "persuasive authority on the federal level," the Court of Appeals of Ohio concluded that "the regulations do establish the standard of care of a reasonable pilot in [Ohio]." *Id.* The court noted both that "the federal air regulations have been adopted by the State of Ohio as its own," citing Ohio Revised Code § 4561.05, and that cases from both the Third and the Ninth Circuits suggested that the adoption of the federal regulations as

(continued...)

F.2d 626, 629 (6th Cir. 1975) (applying FAA regulations
to establish the standard of care controllers owe para-
chutists in FTCA case governed by Ohio law). Indeed, Ohio
has adopted federal air regulations as its own. Ohio
Rev. Code §§ 4561.05, 4561.14. As Judge McCree wrote
in *Freeman*, therefore, "violation of a federal air regula-
tion constitutes a violation of Ohio law." 509 F.2d at 630.

Ms. LeGrande, who bears the burden of proof, has
pointed to no statute, regulation or other directive that
imposes on FAA traffic controllers the responsibility to
transmit MIS weather products to pilots. Indeed, a
review of the governing directives makes clear that no
such obligation exists. At the time Ms. LeGrande was
injured, FAA Job Order 7110.65P prescribed air traffic
control procedures regarding, among other things, the
dissemination of weather-related information to pilots.[12]
The Job Order states, in relevant part:

> Controllers shall advise pilots of hazardous
> weather that may impact operations within 150
> [nautical miles] of their sector or area of jurisdic-
> tion. Hazardous weather information contained

---

[11] (...continued)
the standard of care or as evidence thereof is the norm. *Id.* at *5.
The court found this sufficient to establish ordinary negligence
in that case and, therefore, did not consider whether, because
it involved a violation of a safety statute designed to prevent
the harm at hand, it amounted to negligence per se. *Id.*

[12] These regulations have since been revised and can be found
in substantially the same form at FAA Job Order 7110.65T.

in HIWAS broadcasts includes Airmen's Meteo-
rological Information (AIRMET), Significant Mete-
orological Information (SIGMET), Convective
SIGMET (WST), Urgent Pilot Weather Reports
(UUA), and Center Weather Advisories (CWA).

FAA Job Order 7110.65P § 2-6-2. Indeed, Ms. LeGrande's
expert, when asked whether air traffic controllers were
"permitted to broadcast a HIWAS alert for an MIS,"
answered by saying, "Not that I know of." R.60-6 at 12
(Burgess Dep. 203).

Ms. LeGrande contends, in essence, that the first sen-
tence of FAA Job Order 7110.65P § 2-6-2—"Controllers
shall advise pilots of hazardous weather that may
impact operations within 150 [nautical miles] of their
sector or area of jurisdiction"—operates independently
from the remainder of that subsection, which, in
her view, details *how* air traffic controllers must ad-
vise pilots of hazardous weather. We believe that
Ms. LeGrande's textual interpretation of the job order is a
strained one that, when read in the context of the rest of
the directive, would produce a decidedly unrealistic result.

First, it is important to note, at the outset, that, under
the procedure mandated by the job order, air traffic
controllers in HIWAS areas, including the airspace con-
trolled by the Cleveland Center, are *not* directed to broad-
cast detailed in-flight weather advisories. Instead, as a
general rule, the controllers read the limited information
on a General Information Strip to inform pilots that an
advisory has been published and then instruct pilots
to turn to the HIWAS broadcast on another radio

frequency for more detailed information. The FAA Job Order directs controllers to use the following phraseology: "ATTENTION ALL AIRCRAFT. HAZARDOUS WEATHER INFORMATION [type and number of weather product issued] FOR (geographical area) AVAILABLE ON HIWAS, FLIGHT WATCH, OR FLIGHT SERVICE FREQUENCIES." FAA Job Order 7110.65P § 2-6-2 (noting that the inclusion of the type and number of weather advisory responsible for the HIWAS advisory is optional). Notably, even on the HIWAS frequency,[13] which is dedicated to weather conditions that are of immediate interest to pilots of aircraft currently in flight, MIS weather products are not broadcast because they are *not* immediately pertinent to aviators aloft.

We also cannot accept the suggestion that the FAA Job Order imposes on air traffic controllers a duty to broadcast information about predicted turbulence *regardless of the weather product in which that prediction is included*. It is true that the first sentence of FAA Job Order 7110.65P § 2-6-2 instructs air traffic controllers to "advise pilots of hazardous weather that may impact operations within 150 [nautical miles] of their sector or area of jurisdiction." It is also true that the FAA Pilot/Controller Glossary defines "Hazardous Weather Information" as informa-

---

[13] These products also are not available on Flight Watch or Flight Service frequencies relied upon by aviators traversing areas not covered by a HIWAS service.

tion contained in various listed weather products[14] and "any other weather . . . which is considered significant and [is] not included in a current hazardous weather advisory." To determine the significance of weather conditions, we receive some help from another section of FAA Job Order 7110.65P, which charges the controller to be prepared to suggest alternate routes and altitudes in "areas of significant weather," notes that "[w]eather significant to the safety of aircraft includes such conditions as . . . moderate to extreme turbulence (including [clear air turbulence])." FAA Job Order 7110.65P § 2-6-4(b) note.

Even if we read these provisions to suggest that there may be occasions when an air traffic controller is obliged to alert aloft aircraft to a weather condition such as turbulence when that condition is not included in a current advisory, we do not think that it is plausible to read these documents to require that the controller advise the pilot of the content of an MIS. The relevant Job Order provisions clearly apply to *current specific weather conditions* of sufficient severity to impede the aircraft's flight. As we have noted earlier, the FAA has categorized weather

---

[14] According to the FAA Pilot/Controller Glossary, Hazardous Weather Information includes information contained in urgent PIREPs and CWAs as well as weather products known as SIGMETs, convective SIGMETs, and AIRMETs. None of those weather products are implicated in this case. Notably, the list of weather products that the glossary uses to define Hazardous Weather Information does not include the weather product at issue in this case—an MIS.

products into those that are disseminated to pilots, such as a CWA, and those that are not, such as an MIS, precisely to ensure that pilots receive *useful* information without being distracted by forecasts of no practical significance. The pilot of an aircraft, alert for immediate meteorological dangers, simply would not profit from—or want to be distracted by—the information contained in an MIS.

Here, MIS 02 and MIS 03 pertained to a 10,000- to 15,000-foot high block of airspace above parts of four states—Michigan, Ohio, Pennsylvania and New York—over a period of some twenty hours.[15] Even taking all the facts in the light most favorable to Ms. LeGrande, the general forecast of frequent moderate turbulence to isolated severe turbulence in such a massive area and for such a lengthy period of time, while useful to the FAA for flight planning purposes, was far too indefinite to be of assistance to pilots.

Therefore, not only has Ms. LeGrande failed in carrying her burden of proof, but the governing regulations and job orders make clear that the district court was correct in determining that FAA air traffic controllers have no duty to advise pilots of the content of MIS weather products. FAA personnel in this case therefore had no duty to disseminate the turbulence predictions contained in

---

[15] MIS 02 was issued at 2:42 p.m. About eight and a half hours later, MIS 03 was issued at 9:06 p.m. In total, the prediction encapsulated in MIS 02 and MIS 03 lasted from 2:42 p.m. until 9:06 a.m. the following morning, a total of over twenty hours.

either MIS 02 or MIS 03 to Flight 2745. Nor did air traffic controllers have any duty to broadcast the CWA to Flight 2745; it was limited to airspace that Flight 2745 would not traverse on its path from Cleveland to Chicago.[16]

---

[16] In further support of her contention that air traffic controllers should have broadcast the turbulence predictions from MIS 02 and MIS 03, Ms. LeGrande invites our attention to *United States Aviation Underwriters, Inc. v. United States*, 562 F.3d 1297, 1299 (11th Cir. 2009), in which the Court of Appeals for the Eleventh Circuit stated in the course of its decision: "The United States concedes that, once the National Weather Service forecasts moderate to severe turbulence, the United States government has no discretion to decline to provide that information to pilots." The Government's concession in *Aviation Underwriters* was limited to the duty of an NWS Meteorological Watch Office to disseminate, per NWS procedures, a weather product known as a SIGMET. There is no SIGMET implicated in this case, which revolves instead around an MIS, an entirely different weather product. Additionally, the FAA personnel Ms. LeGrande accuses of negligence in this suit are not governed by NWS directives. The governmental concession on which Ms. LeGrande relies is therefore inapposite to this case.

Ms. LeGrande also relies on *Spurgin-Dienst v. United States*, 359 F.3d 451, 455 (7th Cir. 2004), in which we suggested that an air traffic controller erred by, among other things, not providing a pilot with an MIS about icing conditions. The statement in *Spurgin-Dienst* on which Ms. LeGrande relies is dicta. At the core of that decision was our holding addressing the actions of FAA personnel; we held that the district court

(continued...)

### B. Negligence by NWS Meteorologist Janus

In this appeal, Ms. LeGrande raises, for the first time in this litigation, the allegation that NWS meteorologist Janus negligently failed to provide his turbulence predictions to FAA personnel for dissemination to pilots. This is a new tack, which goes beyond the allegation of negligence by FAA employees that Ms. LeGrande raised in her administrative claim and in her pleadings in the district court. *See* R.45-2 at 4 (Administrative Complaint); R.1 at 3 (Complaint); R.45 at 2-3 (Amended Complaint).

The FTCA contains a threshold requirement that an administrative claim be "presented in writing to the appropriate federal agency." 28 U.S.C. § 2401(b). Indeed, no lawsuit may be filed "unless the claimant shall have first presented the claim to the appropriate Federal agency." 28 U.S.C. § 2675. The Supreme Court has held that this requirement is jurisdictional and not subject to waiver. *McNeil v. United States*, 508 U.S. 106, 112-13 (1993). The allegations in an administrative claim are only sufficient if they put the "legally sophisticated reader" on notice of a connection between the alleged injury and

---

[16] (...continued)
had not clearly erred when it found that the information withheld from the pilot "would not have led [the pilot] to change course." *Id*. We also noted that the "FAA personnel committed errors," including the failure to provide the MIS to the pilot. *Id*. This statement was made in passing without significant discussion and, furthermore, was unnecessary to the outcome in that case.

the specific conduct that the plaintiff is asserting as a basis for the claim. *Palay v. United States*, 349 F.3d 418, 426-27 (7th Cir. 2003) (holding that an agency is notified properly of a claim for purposes of the FTCA if the claim would have been apparent to a "legally sophisticated reader"). The pertinent regulations require an agency in receipt of a claim to transfer that claim to another agency if the activities that gave rise to the claim were activities of that other agency. 28 C.F.R. § 14.2(b)(1). The regulations further provide that, if more than one federal agency is or may be involved in the events that give rise to the claim, the agency receiving the claim must contact the other affected agency in order to designate the single agency that will investigate and decide the merits of the claim. 28 C.F.R. § 14.2(b)(2).

We have examined the administrative claim filed by Ms. LeGrande. It alleges six claims of negligence against the FAA; each claim pointedly alleges a breach of an FAA Job Order. It alleges no claim of negligence against the NWS. In the box for the entry of the "Appropriate Federal Agency" to which the claim is directed, only the FAA is mentioned. In short, the administrative claim is clear; only the FAA's actions are alleged to have been negligent. Under these circumstances, no provision of 28 C.F.R. § 14.2 required the FAA to transfer the claim to the NWS, to notify the NWS of the claim or to determine which agency would undertake the investigation and adjudication of the claim. The very specific allegations of the claim allege negligence on behalf of the FAA and no other federal agency.

As the Supreme Court noted in *McNeil*, the statutory threshold requirement of filing an administrative claim with the appropriate agency is clear and cannot be characterized as a "trap for the unwary." 508 U.S. at 113. Because Ms. LeGrande failed to comply with that administrative requirement, her new allegations are barred by the plain language of the statute.

## Conclusion

The district court correctly determined that Ms. LeGrande had failed to establish that FAA personnel breached any duty owed to her. Additionally, the allegations of the NWS meteorologist's negligence are barred for failure to comply with the statutory requirement that suit under the Federal Tort Claims Act be preceded by an administrative complaint. Accordingly, the judgment of the district court is affirmed.

AFFIRMED